John Lee BROWN, Administrator of
the Estate of Michael P. Brown,
Deceased, Appellee

v.

PROGRESSIVE INSURANCE COMPA-
NY and MOUNTAIN LAUREL AS-
SURANCE COMPANY, Appellants.

Superior Court of Pennsylvania.

Argued March 30, 2004.

Filed Sept. 8, 2004.

Reargument Denied Nov. 18, 2004.

Jeffrey A. Ramaley, Pittsburgh, for Progressive, appellant.

Kelly M. Tocci, Aliquippa, for appellee.

Before: FORD ELLIOTT, LALLY-GREEN, and TODD, JJ.

LALLY-GREEN, J.:

¶ 1 Appellants, Progressive Insurance Company ("Progressive") and Mountain Laurel Assurance Company ("Mountain Laurel"), appeal from the judgment dated August 14, 2003, in favor of Plaintiff/Appellee, John Lee Brown, administrator of the estate of Michael P. Brown. We vacate the judgment and remand for entry of judgment notwithstanding the verdict (jnov) in favor of Appellants.

¶ 2 The factual and procedural history of the case is as follows. Michael Brown was injured in an auto accident on January 13, 1996. All parties agreed that the other driver was solely liable for the accident. Brown retained an attorney and filed claims against both his own insurance carrier (Progressive)[1] and the tortfeasor's carrier, Nationwide Insurance Company (Nationwide).[2] The tortfeasor's Nationwide policy had a bodily injury (BI) limit of $50,000.00. The declarations page of the Progressive policy indicated that Brown had uninsured/underinsured motorist (UM/UIM) coverage of $25,000.00 per person and $50,000.00 per accident, unstacked.[3] These limits were lower than the $50,000.00/$100,000.00 limits for liability in the Progressive policy.

¶ 3 On June 20, 1996, Brown's attorney requested documentation from Progressive that would show that his client had requested the UM/UIM coverages shown on the declarations page. There was disputed testimony at trial as to whether or not Progressive responded to this request.

¶ 4 On December 31, 1997, Brown died of causes unrelated to the accident. Brown's attorney forwarded documentation of his accident-related medical treatment to Progressive on January 10, 1998. Shortly thereafter, Brown's attorney indicated that he planned to pursue a UIM claim against Progressive. Progressive valued the claim at $35,000.00 to $40,000.00, an amount which was less than the $50,000.00 BI limit of the tortfeasor's policy. Therefore, Progressive did not settle the claim or make an offer at that point.

¶ 5 At this time, the insured's claim included lost wages from the date of the accident until Brown's death. Brown was employed by a family business, which continued to pay him after the accident. Brown contended that these payments were not wages, but an advance against his inheritance. Progressive requested additional tax and wage information to value this part of the claim. This information was never received.

¶ 6 In September of 1998, Brown entered into an agreement to settle the BI claim with Nationwide for $25,000.00. Progressive agreed to this settlement, and waived its subrogation rights. For the pending UIM claim, the parties agreed that Progressive would have a credit in the amount of $50,000.00, the limits of the tortfeasor's policy.

¶ 7 At this time, Brown's attorney repeated his request for information concerning Brown's coverage, i.e., the sign-down of UM/UIM coverage and the waiver

---

1. The declarations page also carried the name and address of Mountain Laurel, an entity which is affiliated with Progressive. The identity of Brown's insurer will be discussed in greater detail *Infra*.

2. By October of 1996, Progressive had paid out the $10,000.00 limit of Brown's medical payments coverage and the $5,000.00 limit in lost wage coverage.

3. There were three cars on the Progressive policy.

of stacking. Brown's attorney testified at trial that his two-year delay in repeating his request for this information was due to Brown's death and the attorney's decision to focus on the BI claim before addressing the UIM claim. Progressive provided this information two months later.

¶ 8 In the October 1998 letter from Progressive to Brown's attorney agreeing to the Nationwide settlement, Progressive stated that arbitration would be necessary to settle the UIM claim due to the divergent opinions as to the value of the underlying claim. Progressive placed the total value of the claim at $35,000.00 to $40,000.00; Brown's attorney believed it to be worth $60,000.00 to $75,000.00.

¶ 9 The parties selected arbitrators in December 1998 and January 1999. The neutral arbitrator was appointed in March 1999. A hearing was set for May 6, 1999. Progressive's outside counsel requested a delay in the proceedings to conduct further discovery. On May 14, 1999, Brown's attorney informed Progressive that no claim for lost wages would be presented, eliminating the need for further discovery on that issue. The arbitration was rescheduled for August 5, 1999.

¶ 10 On August 4, 1999, Progressive's attorney was informed that Brown intended to argue that the sign-down and rejection of stacking on his UIM coverage were insufficient as a matter of law. Progressive's attorney requested a postponement of the hearing to allow him to prepare to argue these issues. The arbitration was rescheduled. The claim settled for $25,000.00 on September 2, 1999, on the eve of the rescheduled arbitration date.

¶ 11 On January 24, 2000, Brown filed a bad faith claim against Progressive under 42 Pa.C.S.A. § 8371. On November 21, 2001, the trial court granted Brown's motion to add Mountain Laurel as an additional defendant. The Honorable C. Gus Kwidis held a non-jury trial on August 30, 2002.

¶ 12 Almost four months later, on December 24, 2002, the trial court issued an opinion and order. The court found that Progressive acted in bad faith. The court entered a "punitive damages verdict" of $100,000.00 against Progressive. On January 3, 2003, the court molded the verdict to add interest and costs, and to indicate that Mountain Laurel was liable as well. On the same day, Progressive and Mountain Laurel filed motions for post-trial relief, seeking jnov or a new trial. The trial court denied these motions in an order dated July 18, 2003. This order was docketed on July 22, 2003. On August 14, 2003, the court entered judgment against Progressive and Mountain Laurel. This timely appeal followed.[4]

¶ 13 Appellants raise the following issues on appeal:

1) Whether the trial court erred in denying Progressive Insurance Company's Motion for Judgment Notwithstanding the Verdict as Progressive Insurance Company, as a matter of law, cannot be liable for alleged bad faith and/or punitive damages, as it was not a party to the insurance contract.

2) Whether the trial court erred in denying Progressive/Mountain Laurel's re-

---

4. Appellants filed a notice of appeal to this Court on August 18, 2003. A supersedeas bond was posted on August 22, 2003. A review of the record shows no request by the trial court for a Concise Statement of Matters Complained of on Appeal pursuant to Pa. R.A.P.1925(b). The trial court filed a Rule 1925 opinion on November 10, 2003, addressing whether the trial court abused its discretion in: 1) ruling that Progressive was the appropriate party to the action; 2) finding that Progressive acted in bad faith; and 3) awarding punitive damages in the amount of $100,000.00.

quest for Judgment Notwithstanding the Verdict when the evidence presented was insufficient as a matter of law to support a finding that Progressive/Mountain Laurel acted in bad faith. 3) Whether the trial court abused its discretion in denying Progressive's Motion for Judgment Notwithstanding the Verdict, when the evidence presented was insufficient as a matter of law to satisfy the burden of clear and convincing evidence that Progressive/Mountain Laurel acted in bad faith and was based on findings of fact not supported by the record, in the alternative, the trial court abused its discretion in denying Progressive's Motion for a New Trial, as the findings of fact asserted in the verdict were unsupported by the record such that the verdict was against the weight of the evidence. 4) Whether the trial court erred in denying the motion for a new trial when the finding of bad faith was based upon an issue impermissibly raised, sua sponte, by the trial court. 5) Whether the trial court erred in denying Progressive/Mountain Laurel's request for a new trial as to the issue of punitive damages when the evidence presented failed, as a matter of law, to establish the level of outrageous conduct necessary to justify an award of punitive damages. 6) Whether the trial court erred in denying Progressive/Mountain Laurel's request for a new trial as to the issue on punitive damages when the award was against the weight of the evidence, and based upon the evidence contained within the record was excessive, in violation of the Fourteenth Amendment and bore

no rational relationship to the harm allegedly suffered by Brown.

Appellants' Brief at 5.

¶ 14 In this appeal, Appellants seek jnov.[5] Our Supreme Court has stated that the standard of review for an order "granting or denying judgment notwithstanding the verdict ... [is] whether there was sufficient competent evidence to sustain the verdict." *The Birth Ctr. v. The St. Paul Cos.*, 567 Pa. 386, 787 A.2d 376, 383 (2001). We must view the evidence in the light most favorable to the verdict winner. *Id.* Jnov should be entered only in a clear case, where the evidence is such that no reasonable minds could disagree that the moving party is entitled to relief. *Id.* Review of the denial of jnov has two parts, one factual and one legal:

> Concerning any questions of law, our scope of review is plenary. Concerning questions of credibility and weight accorded evidence at trial, we will not substitute our judgment for that of the finder of fact.

*Van Zandt v. Holy Redeemer Hosp.*, 806 A.2d 879, 886 (Pa.Super.2002) (citation omitted), *appeal denied*, 573 Pa. 686, 823 A.2d 145 (2003).

¶ 15 We review the decision of a trial court in a non-jury case to determine "whether the findings of the trial court are supported by competent evidence, and whether the trial court committed error in the application of law." *Bonenberger v. Nationwide Mut. Ins. Co.*, 791 A.2d 378, 380 (2002). We also note that the factfinder's conclusions must be based upon competent evidence and reasonable inferences therefrom:

**5.** Appellants also seek a new trial in the alternative. Because we will grant the request for jnov, we need not address these alternative claims. *Van Zandt v. Holy Redeemer Hosp.*,

806 A.2d 879, 887–888 (Pa.Super.2002) (citation omitted), *appeal denied*, 573 Pa. 686, 823 A.2d 145 (2003).

The [factfinder] may not be permitted to reach its verdict merely on the basis of speculation and conjecture, but there must be evidence upon which logically its conclusion may be based. Therefore, when a party who has the burden of proof relies upon circumstantial evidence and inferences reasonably deducible therefrom, such evidence, in order to prevail, must be adequate to establish the conclusion sought and must so preponderate in favor of that conclusion as to outweigh in the mind of the factfinder any other evidence and reasonable inferences therefrom which are inconsistent therewith.

*Van Zandt*, 806 A.2d at 886 (citations omitted).

¶ 16 First, Appellants argue that the court erred in denying Progressive's motion for jnov, because Progressive was not a party to the insurance contract. Specifically, Appellants argue that Mountain Laurel was the insurer because: (1) Mountain Laurel's name and address are listed on the declarations page of the policy; (2) the "Pennsylvania Family Car Policy" issued to Brown allegedly lists the insurer as Mountain Laurel Assurance Company; and (3) Brown's application for insurance and his sign-down of UM/UIM benefits contains the Mountain Laurel name. Appellants' Brief at 19–20.

¶ 17 As Appellants correctly point out, an action for bad faith under 42 Pa.C.S.A. § 8371 can only be brought against an "insurer." The Judicial Code does not define "insurer." *SEPTA v. Holmes*, 835 A.2d 851, 856 (Pa.Commw.2003), *appeal denied*, 577 Pa. 738, 848 A.2d 930 (2004). The Insurance Department Act of 1921, as amended, 40 P.S. § 221.3, defines "insurer" as "any person who is doing, has done, purports to do, or is licensed to do an insurance business, and is or has been subject to the authority of, or to liquidation, rehabilitation, reorganization or conservation by any insurance commissioner." *Id.* at 856–857.[6] Thus, it is undisputed that both Progressive and Mountain Laurel are "insurers."

 ¶ 18 Unfortunately, that does not answer the more relevant question, which is: how should courts decide which of two related insurance companies is the "insurer" for purposes of the bad faith statute? This question appears to be one of first impression among Pennsylvania state courts.

 ¶ 19 There is no simple rule for determining who is the insurer for purposes of the bad faith statute.[7] The question is necessarily one of fact, to be determined both by examining the policy documents themselves, and by considering the actions of the company involved. Thus, we look at two factors: (1) the extent to which the company was identified as the insurer on the policy documents; and (2) the extent to which the company acted as an insurer. *See, Lockhart v. Federal Ins. Co.*, 1998 WL 151019, 1998 U.S. Dist. LEXIS 4046 (E.D.Pa. March 30, 1998). This second factor is significantly more important than the first factor, because it focuses on the true actions

6. Using this definition, the Commonwealth Court has held that self-insured entities are not "insurers." *Holmes*, 835 A.2d at 854. Similarly, a Pennsylvania federal court has held that a bad faith claim will not lie against an insurer-affiliated corporate entity which does not act as a de facto "insurer," but instead merely performs administrative tasks. *Lockhart v. Federal Ins. Co.*, 1998 WL 151019, 1998 U.S. Dist. LEXIS 4046 (E.D.Pa. March 30, 1998).

7. We respectfully urge the Legislature to examine this issue, and to amend the bad faith statute if it determines that clarification is necessary.

of the parties rather than the vagaries of corporate structure and ownership.

¶ 20 With respect to the first factor, we note the following. The "Definitions" section of Brown's policy states that the word "We" refers to "the Company providing this insurance." Yet the policy does not define the word "Company." Indeed, the policy does not provide any guidance on how to determine who is the insurer (*e.g.*, "look to the upper left corner of the declarations page.")

¶ 21 The declarations page does list Mountain Laurel's name and address in the upper left hand corner. Mountain Laurel is not specifically labeled as the "insurer" or the "company providing this insurance." In the upper right hand corner of the declarations page, in more prominent type, is the phrase "Progressive Companies," followed by the telephone numbers for "24–hour policy service," "24–hour claims service," and "billing inquiries."

¶ 22 The front page of the "Pennsylvania Family Car Policy" at issue contains the word *"PROGRESSIVE,"* standing alone in large, bolded, italicized type at the top. Farther down the page, in much smaller type, are listed "Progressive Casualty Insurance Company" and "Mountain Laurel Assurance Company," with no further elaboration. The application for insurance contains the words "Mountain Laurel Assurance Company," but again the word "Progressive" is adjacent to Mountain Laurel's name in even more prominent type.

¶ 23 Thus, the record reflects that wherever Mountain Laurel is listed, Progressive is also listed, at least as prominently (if not more so). These facts, combined with a total lack of guidance in the policy itself as to who is the insurer, supports the trial court's finding that Progressive was an appropriate party to this action.

¶ 24 Progressive relies on *Lockhart* to support its claim that it is not the insurer. We agree with the trial court that the instant case is factually distinguishable from *Lockhart*. In *Lockhart*, the policy clearly identified the insurer as Federal Insurance Company. The plaintiff brought suit against Chubb & Son, Inc., Federal's corporate parent. While the Chubb name appeared with Federal's name on some documents, the court found that "Chubb is mentioned nowhere in the substantive terms of the contract." Moreover, the policy in *Lockhart* specifically defined "We" as "the insurance company named in the Coverage Summary." Federal, not Chubb, was listed in the Coverage Summary. Chubb's name appeared only in a copyright notation at the bottom of the page. Therefore, the court found that "one cannot reasonably conclude that defendant Chubb was a party to the insurance policy[.]" *Lockhart*, 1998 WL 151019, At *2, 1998 U.S. Dist. Lexis 4046 at *7.

¶ 25 In contrast, in the instant case, there is no clear statement in the policy and supporting documentation as to the identity of the insurer. Unlike *Lockhart*, the Progressive name appears on all of the documents setting forth the terms of the contract. The trial court thus found that Progressive Insurance Company was the appropriate defendant in this action. Review of the application for insurance, declarations page, and policy entered into evidence in this case leaves no room for doubt that there is competent evidence to support the trial court's finding of fact that Progressive was Brown's insurer, and thus an appropriate party to this bad faith action.

■ ¶ 26 The second factor to consider is the extent to which Progressive acted as Brown's insurer, particularly with respect to the types of activity that may give rise

to a bad faith claim. *Lockhart.* The duty of an insurer to act in good faith "arises because the insurance company assumes a fiduciary status by virtue of the policy's provisions which give the insurer the right to handle claims and control settlement." *Romano v. Nationwide Mut. Fire Ins. Co.,* 435 Pa.Super. 545, 646 A.2d 1228, 1231 (1994). Our Supreme Court has stated that under a policy of automobile insurance, the insurer undertakes three obligations to the insured that give rise to the expectation of good faith dealings: to indemnify against liability, to defend the insured in suits arising under the policy, and to handle claims and control settlement. *Gedeon v. State Farm Automobile Ins. Co.,* 410 Pa. 55, 188 A.2d 320, 321–322 (1963); *see also, Birth Ctr.,* 787 A.2d at 389.

¶ 27 As noted at length *infra,* Progressive handled the medical payments and lost wages claim, approved the third party settlement, waived its subrogation rights, and handled all aspects of the UIM claim. In this respect, the record overwhelmingly establishes that Progressive was Brown's insurer. To hold otherwise would create a situation where insurers are judged not on their actions, but on their corporate structures. The record supports the trial court's factual finding that Progressive was Brown's "insurer." [8] Appellants' first claim fails.

¶ 28 Next, Appellants argue that the trial court erred in failing to grant jnov, because the evidence was insufficient to show that Appellants acted in bad faith toward Brown.

¶ 29 The Pennsylvania Legislature has created a statutory remedy for an insurer's bad faith conduct.[9] The statute provides:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
>
> (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
>
> (2) Award punitive damages against the insurer.
>
> (3) Assess court costs and attorney fees against the insurer.

42 Pa.C.S.A. § 8371.

¶ 30 Initially, we note that the bad faith statute extends to the handling of UIM claims. "An individual making a UIM claim is making a first party claim, however the valuation of that claim may follow traditional third party claimant concepts. . . . and whether a UIM is handled much like a third party claim for valuation purposes, the insurer remains committed to engage in good faith with its insured." *Bonenberger,* 791 A.2d at 380.

¶ 31 Bad faith encompasses a wide variety of objectionable conduct. For example, bad faith exists where "the insurer did not have a reasonable basis for denying benefits under the policy and that the insurer knew of or recklessly disregarded its

---

8. In *Lockhart,* the court acknowledged the possibility that an insurer who is not listed as a party in the contract itself nevertheless may be held liable under theories such as agency, alter ego, or "de facto insurer." *Lockhart, supra* 1998 WL 151019, At *4, 1998 U.S. Dist. LEXIS at *5–6. Like the *Lockhart* court, we acknowledge this possibility as well. Because these issues are not present in the instant case, however, we need not address them. As noted above, Progressive was identified as the insurer within the contract documents in this case.

9. For a discussion of the interplay between the common law and § 8371 with respect to bad faith, *see, Birth Ctr.,* 787 A.2d at 385–389.

lack of reasonable basis in denying the claim." *O'Donnell v. Allstate Ins. Co.*, 734 A.2d 901, 906 (Pa.Super.1999), *citing, MGA Ins. Co. v. Bakos,* 699 A.2d 751, 754 (Pa.Super.1997); *see also, Terletsky v. Prudential Prop. and Cas. Ins. Co.,* 437 Pa.Super. 108, 649 A.2d 680, 688 (1994) (bad faith is a frivolous or unfounded refusal to pay the proceeds of a policy done with dishonest purpose, motivated by self-interest or ill will). Bad faith conduct also includes "lack of good faith investigation into fact[s], and failure to communicate with the claimant." *Romano,* 646 A.2d at 1232; *see also, Birth Ctr.,* 787 A.2d at 378 (upholding a finding of bad faith where the insurer intransigently refused to settle a claim that could have been settled within policy limits, where the insurer lacked a bona fide belief that it had a good possibility of winning at trial, thus resulting in a large damage award at trial); *O'Donnell,* 734 A.2d at 906 (bad faith "may also extend to the insurer's investigative practices").

¶ 32 Recently, in *Hollock v. Erie Ins. Exch.,* 842 A.2d 409 (Pa.Super.2004) (*en banc* ), this Court upheld a trial court's finding of bad faith where well-documented evidence at trial established that the insurer misrepresented the amount of coverage, arbitrarily refused to accept evidence of causation, secretly placed the insured under surveillance, acted in a dilatory manner, and forced the insured into arbitration by presenting an arbitrary "low-ball" offer which bore no reasonable relationship to the insured's reasonable medical expenses, and which proved to be 29 times lower than the eventual arbitration award.

¶ 33 On the other hand, our Courts have not recognized bad faith where the insurer makes a low but reasonable estimate of the insured's losses, or where the insurer made a reasonable legal conclusion based on an area of the law that is uncertain or in flux. *Terletsky,* 649 A.2d at 688–689; *see also, O'Donnell,* 734 A.2d at 910 (in the absence of evidence of a dishonest purpose or ill-will, it is not bad faith to take a stand with a reasonable basis or to "aggressively investigate and protect its interests" in the normal course of litigation).

¶ 34 To constitute bad faith, it is not necessary that the insurer's conduct be fraudulent. *Adamski v. Allstate Ins. Co.,* 738 A.2d 1033, 1036 (Pa.Super.1999) *appeal denied,* 563 Pa. 655, 759 A.2d 381 (Pa.2000). However, mere negligence or bad judgment is not bad faith. *Id.* To support a finding of bad faith, the insurer's conduct must be such as to "import[] a dishonest purpose." *Id.* In other words, the plaintiff must show that the insurer breached its duty of good faith through some motive of self-interest or ill will. *Id.* Bad faith must be shown by clear and convincing evidence. *O'Donnell; Adamski.*

¶ 35 With these principles in mind, we now turn to the facts of the instant case. In its initial memorandum Opinion and Order dated December 24, 2002, the trial court explained its finding of bad faith as follows:

Individuals expect that their insurers will treat them fairly and properly evaluate any claim they may make. A claim must be evaluated on its merits alone, by examining the particular situation and the injury for which recovery is sought. An insurance company may not look to its own economic considerations, seek to limit its potential liability, and operate in a fashion designed to "send a message". Rather, it has a duty to compensate its insureds for the fair value of their injuries. Individuals make payments to insurance carriers to be insured in the event coverage is needed. It is the responsibility of insurers to

treat their insureds fairly and provide just compensation for covered claims based on the actual damages suffered. Insurers do a terrible disservice to their insureds when they fail to evaluate each individual case in terms of the situation presented and the individual affected.

[Progressive] relies on the testimony of Plaintiff's counsel, that after he received the "sign-down" and rejection forms from Progressive on November 4, 1998, he did not question the issues of coverage until August 5, 1999.

Even though Plaintiff's counsel did not stress the "sign-down" and issues of coverage until August 5, 1999, just after the second scheduled Arbitration Hearing, on August 5, 1999[sic], [Progressive] did not deal fairly with Plaintiff's counsel and discuss the issues and amount of coverage even though [Progressive] was clearly aware of the issues as evidenced by the [Progressive's] own claim notes.

At trial, the testimony of Colleen Rotuno, the claim representative of [Progressive], clearly established that "... this case was not a question of evaluation but the effect or 'fall out' of the 'sign down' ..." Ms. Rotuno also testified that [Progressive] had no confidence in its trial counsel and felt that trial counsel was not capable of handling the arbitration and issues.

Based on the foregoing, this Court finds that the Defendant, Progressive Insurance, acted in bad faith by failing to properly evaluate this claim and by failing to act in good faith and fair dealing concerning the amount of U.I.M. coverage and the stacking of U.I.M. coverage through motive of its own self-interest in minimizing its exposure.

Trial Court Opinion, 12/24/2002, at 7–8.

¶ 36 The trial court based its legal conclusions on a number of factual findings, which may be summarized as follows.

First, Progressive failed to properly evaluate the true value of Brown's claim. Second, on January 20, 1998, Brown's counsel delivered a settlement package to Progressive with a demand for $100,000.00. Third, Progressive responded to Brown's counsel by indicating that the case had little to no value over and above the $25,000.00 that Nationwide already paid on the BI claim. Fourth, Progressive knew or strongly suspected that it had a "problem" with the sign-down of UIM coverage and waiver of stacking, such that Progressive's UIM exposure could be $150,000.00 rather than $25,000.00, based on this Court's then-binding decision in *Winslow–Quattlebaum v. Maryland Cas. Co.*, 723 A.2d 681 (Pa.Super.1998). Fifth, Progressive chose not to discuss this coverage "problem" with Brown's counsel until the eve of arbitration, when Brown's counsel indicated that he intended to argue that the sign-down was invalid. Finally, Progressive knew that its own attorney was unprepared to properly argue the coverage issue, so Progressive settled the case for $25,000.00. Trial Court Opinion, 12/24/2002, at 2–6 (findings of fact # 13, # 6, # 7, # 9, and # 14).

¶ 37 After a thorough review of the record, we are constrained to conclude that these critical factual findings are either unsupported by the record or do not rise to the level of bad faith. A full discussion follows.

¶ 38 First, the record does not support the trial court's factual finding that Progressive failed to adequately evaluate Brown's claim. We must bear in mind that: Progressive would not be liable for any UIM claim unless the total value of that claim exceeded $50,000.00 (*i.e.*, the limits of Nationwide's BI policy). In other words, Progressive was liable only for the amount which exceeded $50,000.00.

¶ 39 Progressive and Brown's counsel ultimately agreed to settle this case for $25,000.00. This settlement suggests, but by no means is conclusive of, a total claim value of $75,000.00. *See, Williams v. Nationwide Mut. Ins. Co.,* 750 A.2d 881, 887–888 (Pa.Super.2000) (settlement offers do not necessarily reflect the true value of a claim). There is no evidence in the record suggesting that Brown's claim was worth more than $75,000.00. Indeed, this case is unusual because the case never proceeded to a factfinder; thus, no facts were ever developed as to the true value of Brown's claim. *Compare, Hollock, supra* (insurer's unreasonable settlement offer was 29 times lower than the actual arbitration award). Indeed, the record as a whole supports the conclusion that $75,000.00 was at the highest end of either party's valuation. The record further reflects that Progressive adequately evaluated the claim, and believed that the total value [10] was worth around $35,000.00 to $40,000.00. In other words, Progressive reasonably believed that it would owe nothing, because it was entitled to a $50,000.00 credit from Nationwide.[11] Progressive did concede that with a wage loss claim, the value could possibly exceed the $50,000.00 credit. Brown's attorney, in contrast, valued the claim to be worth around $100,000.00 while Brown was still alive, but felt that post-mortem, the claim had a total value between $60,000.00 and $75,000.00. Any suggestion that Brown's claim exceeded $75,000.00 is completely a matter of speculation. *See, Williams,* 750 A.2d at 887–888 (settlement offers do not necessarily reflect the true value of a claim). Thus, the record does not support with clear and convincing evidence the trial court's conclusion that Progressive failed to properly evaluate the claim. *See, Terletsky, supra* (low but reasonably supported settlement offer is not a basis for a finding of bad faith).

¶ 40 Next, the record does not support the trial court's factual finding that Brown's counsel delivered to Progressive a written "settlement package" demanding $100,000.00, or that Progressive responded to this "settlement package" by stating that it believed the case would be worth less than $50,000.00. These facts are sim-

---

**10.** This "total value" included medicals, pain and suffering, and wage loss calculated based upon two years of earnings at $700.00 per week.

**11.** Progressive first began monitoring Brown's injuries on January 16, 1996, three days after the accident. Progressive noted on August 9, 1996, that it received information from Nationwide that Brown was checked for everything and that it was all in the normal range, with the exception of a broken wrist. At this point, Progressive also took notice of the fact that Brown's injuries may not heal well as a result of his diabetes. Progressive indicated on September 4, 1996, that it had received and reviewed records from the Beaver County Bone and Joint Doctors, detailing Brown's injuries. Claim Note, 9/4/1996. In addition, Progressive noted that Brown was a possible eggshell claimant. Claim Note, 9/9/1996. Progressive's notes detailed the extent of the injuries. Nationwide anticipated possibly settling its BI claim around $20,000.00. It subsequently settled the BI claim for $25,000,00, thus entitling Progressive to a $50,000.00 credit. Progressive, in its review dated September 16, 1998, stated, "[b]ased upon medicals I have in file, [it] does not appear that claim value would exceed the $50,000 limits." Claim Note, 9/16/1998.

In addition to the claim notes, Progressive's claims adjuster Colleen Rotunno testified at trial that she had reviewed all of the information pertinent to Brown's claim. She testified at length that she reviewed the medical records, including the initial accident injuries as well as subsequent injuries related to the accident, and the effect of the injuries on Brown's life. N.T., 8/30/2002, at 130–144. She testified that in her opinion, the claim was worth approximately $35,000.00. *Id.* at 143. This opinion was then reviewed by her supervisor. *Id.*

ply not in the record.[12] The first and only indication of either a settlement request, or demand, presented by the evidence, was offered by Progressive. This offer was ultimately accepted by Brown on September 2, 1999. In any event, under the facts presented here, we fail to see how such a series of events (assuming *arguendo* that they took place) would have any bearing on Progressive's good faith or bad faith. Again, the record does not reflect that the claim was ever actually worth more than what Progressive paid.

¶ 41 The trial court places significant emphasis on Progressive's internal debate over the validity of Brown's stacking waiver and sign-down of UIM limits. The court quotes from a claim note dated November 5, 1998, which states: "...The U.M./U.I.M. forms are on one page-however actual U.M./U.I.M. coverage was not rejected as it was in *Lucas*. The issue here is the stacking rejection and these are signed/dated but on one page. We have never been tested on this issue so we are unsure if this is a problem." Trial Court Opinion, 12/24/2002, at 4 (finding of fact 13).

¶ 42 Essentially, the trial court faults Progressive for failing to discuss these issues in a timely manner with Brown's counsel, and for settling the case only after it believed that it might lose a legal argument that the waiver and sign-down were valid.[13]

¶ 43 Under the facts presented in this case, we again fail to see how this evidence, even if true, represents clear and convincing evidence of bad faith on Progressive's part. The record reflects the following. Under the "best case scenario" for Progressive, Brown's policy limit was $25,000.00 (*i.e.*, a valid sign-down of UIM limits from $50,000.00 to $25,000.00, and a valid rejection of stacking). Under the "worst case scenario" for Progressive, Brown's policy limit was $150,000.00 (*i.e.*, $50,000.00 UIM limits stacked on three cars). Progressive and Brown's counsel

---

**12.** The January 20, 1998 letter states, "[p]ursuant to our telephone conversation of last week, please find enclosed all of the medical documentation I have on file along with the letter from his employer, Brown's Antiques." R.R. 400a. Upon review of the January 20, 1998 letter, we do not agree that this was a request for settlement of the UIM claim. The letter does not provide any evidence of a $100,000.00 settlement demand ever being made. It is also not possible to come to this conclusion based upon the information enclosed with the letter, or from the testimony at trial.

The evidence only indicates that the letter of January 20, 1998 contained medical records and a wage loss letter to Ms. Rotunno. Brown's attorney testified that the January 20, 1998 letter was a follow up to a conversation with Rotunno, and it contained medical records that he felt were relevant, along with the letter from Brown's employer. N.T., 8/30/1998, at 46–47. While Brown's attorney did at one point orally communicate to Progressive his opinion that the claim was worth $100,000.00, he later revised that assessment

to $60,000.00 to $75,000.00 after Brown's death. *Id.* at 52–53.

**13.** The trial court's finding of fact # 9 states: "It should be noted that Progressive's claim records date September 16, 1998, recognized the problem when [Progressive's] adjuster stated ...RVW (review) of what I have on file indicates that there was an improper stacking rejection as all on same page. The other issue will be the sign down as insured selected lower limits of U.M./U.I.M. (25/50) than liability (50/100). 'If plaintiff's decedent would stack U.I.M. coverage it would have been three (3) vehicles at $50,000 for a total of $150,000. (Emphasis Added).' ' "

We observe that the bolded language is not contained within the Progressive claim records dated September 16, 1998. Although Progressive did make the unbolded entry on September 16, 1998, Progressive, throughout the record, indicates that its claim people were unsure if this was actually a problem. There is no clear indication that Progressive felt that this stacking waiver was improper.

voluntarily settled the case before trial for $25,000.00. Thus, there is no clear indication in the record that the stacking or sign-down issues had any bearing on this case, because the case was freely and voluntarily settled for an amount which was equivalent to a validly signed-down, unstacked UIM limit. The record reflects that Progressive never deceived Brown or forced him to settle the case for less than what the case was worth.

■ ¶ 44 The record also reflects that both sides were aware of a pending legal argument over the validity of the sign-down and the stacking waiver. The law in this area was far from clear at the time of settlement.[14] Rather than fight this legal battle, both sides chose to avoid this battle and settle the case for $25,000.00 instead. Thus, even if Progressive hoped to settle the case for $25,000.00 to avoid a larger verdict and an adverse legal ruling from the arbitrators, it is equally likely that Brown also settled the case to avoid an smaller award and an adverse legal ruling from the arbitrators. Again, there is no evidence in the record that the claim was ever worth more than $25,000.00. As such, it is impossible to determine that voluntarily settling the case for that figure represents any measure of bad faith on Progressive's part, let alone clear and convincing evidence of bad faith. We also note that insurers should not be faulted for taking a reasonable legal position when the state of the law in a particular area is unclear or in flux. *Terletsky, supra.* Such was the case here.

■ ¶ 45 Before concluding, we note that the trial court's Rule 1925 opinion proffers one additional reason for its finding of bad faith. Specifically, the court reasoned that Progressive "unreasonably delayed" payment of Brown's UIM claim for an unreasonable amount of time and for an improper purpose. The trial court explained its reasoning as follows:

In the instant case, Plaintiff came forward with clear and convincing evidence that Defendant–Progressive wrongfully delayed the payment of Plaintiff's UIM benefits for almost two years in an effort to minimize exposure. Plaintiff presented evidence that his attorneys requested documentation of plaintiff's UIM coverage on June 20, 1996. (Plaintiff's trial exhibit 6). Plaintiff also showed that his attorney first placed defendant-Progressive on notice of any potential UIM claim on August 14, 1996. (Plaintiff's trial exhibit 11). On September 3, 1998, plaintiff's attorney authored a second letter requesting a response to his June

---

14. At the time of settlement, the two most important cases to this dispute were *Winslow–Quattlebaum, supra,* and *Lucas v. Progressive Cas. Ins. Co.,* 451 Pa.Super. 492, 680 A.2d 873 (1996). In *Winslow–Quattlebaum,* 723 A.2d at 683, this Court held that a party's rejection of UIM coverage was invalid because it appeared on the same sheet of paper as other rejection language (specifically, rejection of UIM stacking). We note that *Winslow–Quattlebaum* concerned rejection of UIM coverage, not a sign-down to lower limits (as was the issue in the instant case). Moreover, at the time of Brown's settlement with Progressive, *Winslow–Quattlebaum* was on appeal to the Pennsylvania Supreme Court. On June 20, 2000, our Supreme Court reversed this Court's decision. *Winslow–Quattlebaum v. Maryland Ins. Group,* 561 Pa. 629, 752 A.2d 878, 882 (2000). Our Supreme Court also noted that rejection of UIM stacking need not be on a separate sheet of paper from other rejection forms. *Id.* at 882.

In *Lucas,* this Court held that rejection of UIM coverage may not be on the same page as rejection of UM coverage. Again, however, the instant case did not concern rejection of UM/UIM coverage, but rather a sign-down to lower limits. That issue was unresolved until this Court decided *Lewis v. Erie Ins. Exch.,* 753 A.2d 839 (Pa.Super.2000). *Lewis* was decided in May 2000, about eight months after Brown and Progressive settled their case in September 1999.

20, 1996 letter regarding plaintiff's UIM coverage. (plaintiff's Trial Exhibit 31; T.T. 48. This letter was acknowledged in defendant-Progressive's September 16, 1998 notes which admit that there was an "improper stacking rejection" of plaintiff's UIM benefits. (Plaintiff's trial Exhibit 32.) Plaintiff's attorney received confirmation that plaintiff did in fact "reject" the UIM stacking benefits. (Plaintiff's trial exhibit 39). However, plaintiff's "rejection" was on the same page as the rejection of ordinary UIM coverage which was, at the time, held to be ineffective by the Pennsylvania Superior Court. [footnote: *See, Winslow–Quattlebaum, supra*]. A UIM arbitration hearing was scheduled to commence [on] May 6, 1999, but was rescheduled by defendant-Progressive until August 5, 1999. Plaintiff offered evidence at the trial demonstrating that defendant-Progressive then sought another continuance until September 3, 1999, but ultimately settled the UIM claim before the hearing for $25,000.00 because defendant-Progressive lacked confidence in its ability to defend against any potential coverage issues.

Trial Court Opinion, 11/10/2003, at 6–7.

¶ 46 Again, we note that the record does not support certain key factual findings. For example, the trial court found that Brown's attorney's letter of September 3, 1998 was "requesting a response" to his June 20, 1996 letter. *Id.* at 6. The June 20, 1996 letter reads in pertinent part as follows:

Dear Mr. Smith:

I represent Mr. Michael P. Brown with respect to injuries he sustained as the result of being involved in an automobile accident on the above date [1/22/96]. In reviewing Mr. Brown's policy of insurance it is indicated that the policy provides for the nonstacking of UIM/ coverage and also provides for lower UIM limits than that of the applicable liability coverage.

Pursuant to the recent Pennsylvania Superior Court decision in *Tukovit[ ]s v. The Prudential Insurance Company,* I am requesting that you provide to my office (1) Mr. Brown's written election for lower UIM limits (2) Mr. Brown's written election that the UIM coverage not be stacked and (3) written documentation that Progressive complied with the written notice requirements set forth in Section 1791 of the Motor Vehicle Financial Responsibilities Law.

Your anticipated cooperation in this regard is appreciated.

Plaintiff's Trial Exhibit 6.

¶ 47 The September 3, 1998 letter reads in pertinent part as follows:

Dear Sir/Madam:

Our office represents your insured, Michael Brown, who was injured in an automobile accident on January 13, 1996.

Upon examination of my client's insurance policy, I noted the following:

1. That the policy contains lower limits of UM/UIM coverage; and

2. That the policy contains non-stacked UM/UIM coverage.

With respect to the lower limits on UM/UIM coverage I am requesting that I be provided a copy of the written request for this coverage as required by Section 1734 of the MVFRL. Also with respect to the non-stacking of UM/UIM coverage I would appreciate receiving a copy of the section 1738(b) written waiver.

If you have any questions, please do not hesitate to contact me.

Plaintiff's Trial Exhibit 31.

¶ 48 Upon review of the September 3, 1998 letter, we note that there is no rea-

sonable way to conclude that it is "requesting a response" to the June 16, 1996 letter. Moreover, this was also the first time in over two years that a request for the signed documentation for the lower UM/ UIM benefits had been made. There is no evidence on record indicating that Brown had attempted to make other requests to obtain this information. In support of this conclusion, during the trial testimony, Brown's attorney was asked if he had received a response to his June 16 letter. (T.T. at 153a). After a response of "no," he was subsequently asked if he had followed up on his request for the waiver information. He stated:

> Well, yes, I did follow up, but as you will see from the dates of the correspondence, I didn't follow up immediately, and I believe that that was due, in part, to the fact that prior to the time that Mr. Brown died, we were trying to still see where his injuries were going to be going in terms of additional treatment or when or if he was ever going to get better, and then once he died, then I was focusing on the third party claim, and then when that was resolved, getting back into the UIM file, it was determined that I had never received a response from my June, '96 letter. So, I wrote again and asked for the information.

N.T., 8/30/2002, at 48. Thus, the record does not reflect that Progressive engaged in the type of stalling tactics that may be indicative of bad faith.

¶ 49 The trial court also reasoned that Progressive knowingly took an erroneous or disingenuous position on the validity of Brown's sign-down and stacking waiver, in light of this Court's then-binding decision in *Winslow–Quattlebaum.* The court reasoned that based on *Winslow–Quattlebaum,* Brown's waiver of UIM stacking was definitely invalid.

¶ 50 Again, we disagree. As noted in footnote 14, *supra,* this Court's decision in *Winslow–Quattlebaum* involved complete rejection of UIM benefits. The instant case involved a sign-down of UIM benefits and a rejection of UIM stacking. These issues were not present in *Winslow–Quattlebaum;* thus, the state of the law in this area was at best unclear. Indeed, Progressive's November 5, 1998 claim notes accurately identified the distinctions between the instant case and prior case law. The record does not support the court's finding that Progressive knowingly took an erroneous or disingenuous legal position on these issues. At best, the record reflects that Progressive held an internal debate on whether the sign-down and waiver of stacking would be found valid or invalid.

¶ 51 The record further reflects that internally, Progressive took the position that it was entitled to a $50,000.00 credit for the BI claim, and that Brown's claim would not likely exceed this limit. *See, e.g.,* Progressive's March 1, 1999 claim notes. Because the record reflects that Progressive took a reasonable position on these unresolved legal issues and valuation issues, we cannot agree that Brown presented clear and convincing evidence of bad faith conduct. *See, Terletsky, supra.*

¶ 52 Finally, the trial court seems to blame all of the delay in settling this case on Progressive. The record again does not support this conclusion. For example, the record reflects that as late as May 14, 1999, Brown's attorney dropped his wage loss claim and apologized for failing to respond to Progressive's request for tax records. After Brown's death, the information as to whether Brown was still going to proceed with his wage loss claim was relevant for Progressive's evaluation of the claim. During the time period from the accident until Brown's death, Brown was still receiving income from the family

business. After Brown dropped his wage loss claim, Progressive's potential exposure was lowered.

¶ 53 The case settled less than four months later, on September 2, 1999. Thus, the record reflects that the value of the claim was in flux until approximately four months before settlement. We cannot agree that Progressive "unreasonably delayed" settlement under these facts, or that Progressive's actions from May 14, 1999 to the date of settlement constituted clear and convincing evidence of bad faith. *Compare, Wood v. Allstate Ins. Co.*, 1997 WL 602796, 1997 U.S. Dist. Lexis 14663 (E.D.Pa.1997) (finding bad faith in handling plaintiff's UIM claim where adjuster took no action on the claim for almost two years, claiming an inability to value the claim, where the evidence established that the claim could have easily been valued earlier); *Kraeger v. Nationwide Mut. Ins. Co.*, 1996 WL 547207, 1996 U.S. Dist. Lexis 18373 (E.D.Pa.1996) (denying insurer's motion for summary judgment on plaintiff's bad faith claim where insurer made no attempt to independently evaluate plaintiff's claim, ignored settlement offers, offered an arbitrarily low settlement figure many months later, and finally settled for policy limits after almost one year).

¶ 54 Progressive ultimately settled a claim for $25,000.00 that it reasonably believed to be worth nothing. Cases may settle for any number of reasons, including reasons which are unrelated to the true value of the claim.[15] Parties often settle claims for more than they think the claim is worth, in order to avoid the possibility of a larger adverse verdict at trial. This is the essence of the settlement process. This is precisely what Progressive did. To the extent that this process may be de-

scribed as "self-interested," it is not the type of self-interest which gives rise to a bad faith claim. Ironically, by avoiding a trial on the underlying claim, Progressive now faces a large ($100,000.00) adverse verdict at a different trial, this time for bad faith.

¶ 55 For the reasons set forth above, we conclude that the trial court's finding of bad faith was unsupported by sufficient facts in the record. To the extent that the court's factual findings were supported by the record, we conclude that they were insufficient as a matter of law to provide clear and convincing evidence of bad faith. Accordingly, we are constrained to vacate the judgment and remand for entry of jnov in favor of Appellants. As a result of our disposition, we need not address Appellants' remaining issues.

¶ 56 Judgment vacated. Remanded for entry of jnov in favor of Appellants. Jurisdiction relinquished.

---

**15.** For example, Brown's attorney indicated that the primary reason he settled the Nationwide claim for $25,000.00 was that his client had died for reasons unrelated to the accident. In counsel's opinion, juries are not particularly sympathetic to this type of case. N.T., 8/30/2002, at 50–51.