**Cynthia A. NORDI, an Individual, Appellant**

v.

**KEYSTONE HEALTH PLAN WEST INC., and Highmark, Inc., Appellees.**

Superior Court of Pennsylvania.

Argued Aug. 26, 2009.

Filed Jan. 22, 2010.

David S. Senoff, Philadelphia, for appellant.

Michael P. Robic, Pittsburgh, for Highmark, appellee.

BEFORE: BENDER, BOWES and CLELAND *, JJ.

* Retired Senior Judge assigned to the Superior Court.

1. Highmark employees, pursuant to a Service Agreement with Keystone and on its behalf, handled and made all coverage decisions, in-

**OPINION BY CLELAND, J.:**

¶ 1 Appellant Cynthia A. Nordi (Nordi) appeals the order of the Allegheny County Court of Common Pleas granting the summary judgment motions of Appellees Keystone Health Plan West, Inc. (Keystone) and Highmark, Inc. (Highmark) in a dispute over the extent of health insurance coverage provided by Keystone under an HMO plan administered, in part, by Highmark under a Service Agreement. The parties' dispute requires us to address whether the Appellees violated the insurance "bad faith" statute, 42 Pa.C.S.A. § 8371, and whether an HMO is exempted from the bad faith statute by the Health Maintenance Organization Act, 40 P.S. §§ 1551–1567 (HMO Act). For reasons that follow, we affirm.

¶ 2 Before she was injured in a May 2001 car accident, Nordi purchased an "Individual HMO Subscriber Agreement" or HMO policy from Keystone, an HMO subsidiary of Highmark. To aid in the recovery from her injuries, Keystone approved 20 outpatient physical therapy visits beginning March 22, 2002, and ending May 21, 2002.[1] On May 23, Nordi requested additional therapy sessions to continue her progress toward recovery, but Keystone denied her request on the ground she had exhausted her coverage which, in its view, permitted only 60 days of therapy. Keystone relied on the "Schedule of Copayments and Limitations" section of the policy which read:

> Services [occupational, physical, speech and/or cardiac rehabilitation therapy] are limited to treatment for conditions which in the judgment of the PCP and [Keystone] are subject to significant im-

cluding those made for Nordi. Answers and Objections to Plaintiff's Interrogatories (First Set) Addressed to Defendant Highmark Inc., 4/12/2006, at ¶ 6.

provement within a period of sixty (60) days and are limited to sixty (60) days from initiation of treatment per condition, per type of therapy.

Amended Complaint, Exhibit A. Denied benefits, Nordi discontinued the therapy recommended as necessary by her doctor. As a result, the withdrawal of therapy has "hampered her recovery and delayed her functional return." Response to Motion for Summary Judgment, Exhibit I (January 10, 2008 letter from Dr. Steven E. Kann).

¶ 3 On February 19, 2004, Nordi filed her complaint against Appellees alleging breach of contract, bad faith denial of insurance benefits under the "bad faith" statute, and violations of the Unfair Trade Practices and Consumer Protection Act (CPL), 73 P.S. §§ 201–1–201–9.3. On August 26, 2008, the trial court granted summary judgment on the basis the plain meaning of the disputed contract language was to provide therapy sessions over a 60–day period beginning with the first therapy session. Trial Court Memorandum, 8/26/2008, at 1–2. The court found it unnecessary to reach the other issues. *Id.* On September 2, 2008, Nordi filed a timely appeal. The trial court did not order a Statement of Errors Complained of on Appeal.

¶ 4 On appeal, Nordi raises the following issues:

1. Whether the Court erred in finding that coverage for the claim at issue was properly denied because the language of the exclusion supporting denial was unambiguous, where there was clear evidence in the record that the policy language in question had previously been interpreted in favor of coverage for the insured, and the language was known by the insurer to be ambiguous and cause substantial confusion.

2. Whether the Court had erred in dismissing the entire action based solely upon its grant of summary judgment relating to the breach of contract claim, where other independent causes of action were also raised in the Amended Complaint.

Appellant's Brief at 3.

■■■ ¶ 5 In reviewing a summary judgment entered by a trial court:

A reviewing court may disturb the [entry of summary judgment] only where it is established that the court committed an error of law or abused its discretion. As with all questions of law, our review is plenary.

In evaluating the trial court's decision to enter summary judgment, we focus on the legal standard articulated in the summary judgment rule. The rule states that where there is no genuine issue of material fact and the moving party is entitled to relief as a matter of law, summary judgment may be entered. Where the non-moving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment. Failure of a non-moving party to adduce sufficient evidence on an issue essential to his case and on which it bears the burden of proof [...] establishes the entitlement of the moving party to judgment as a matter of law. Lastly, we will review the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party.

*Reeves v. Middletown Athletic Ass'n,* 866 A.2d 1115, 1124–25 (Pa.Super.2004) (citations and quotation marks omitted). Whether a claim for insurance benefits is covered by a policy is a matter of law which may be decided on a summary judg-

ment motion. *Tenos v. State Farm Ins. Co.,* 716 A.2d 626, 628 (Pa.Super.1998).

¶ 6 Nordi argues the coverage language was ambiguous and, because drafted by the Appellees, must be resolved against them.

■■■ ¶ 7 We begin with a definition of "ambiguous":

Contractual language is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. This is not a question to be resolved in a vacuum. Rather, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts. We will not, however, distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity.

The polestar of our inquiry, therefore, is the language of the insurance policy.

*Madison Construction Co. v. The Harleysville Mut. Ins. Co.,* 557 Pa. 595, 606, 735 A.2d 100, 106 (1999) (quotation marks and internal citations omitted).

■■ ¶ 8 Nordi parses the disputed contract language as follows:

The second clause of the specific provision at issue states: "... and are limited to sixty (60) days from initiation of treatment per condition, per type of therapy." Notably absent from this clause is the word "period" which is present in the first clause of the provision. The first clause clearly conditions the availability of coverage on a showing of significant improvement within a "period of sixty days," whereas the second clause simply states "... and are limited to sixty (60) days ..." without any specification that the limitation refers to time. Without the word "period" before the limitation of sixty days, the language

implies that coverage is for sixty days of therapy rather than therapy performed within a period of 60 days.

This second clause is ambiguous because it can reasonably be interpreted to provide for more or less coverage. It is not clear whether this language applies to sixty *calendar* days, as KHPW and Highmark contend, or to sixty *therapy* days as Ms. Nordi contends.

Appellant's Brief at 9–10.

¶ 9 We join the trial court in holding the plain and common sense meaning of the disputed contract language obligates Keystone to pay for therapy services rendered within 60 days of the first visit—hence, the reference to the 60 days "from the initiation of treatment." The reference to *initiation of treatment* marks the *first* day of a 60–day period. If the second clause, instead, referred to 60 therapy sessions, there would be no need to identify any beginning date, which is the very function the language "from initiation of treatment" plainly fulfills. Moreover, unlike sections of the HMO policy, such as outpatient mental health coverage which limits benefits to "twenty (20) visits per calendar year," the disputed language does not suggest the therapy *visits* are to be 60 in number. "We will not[ ] distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity." *Madison Construction Co.,* 557 Pa. at 606, 735 A.2d at 106.

■■ ¶ 10 Nordi asks us to consider two additional factors in our analysis. First, she points to a Keystone training tape for its customer service representatives to address insureds' inquiries about therapy coverage, and to admissions in deposition testimony by Highmark and Keystone administrative personnel indicating many Keystone insureds have made inquiries or submitted administrative appeals regarding the coverage limitation. Nordi reasons

this anecdotal evidence proves the disputed language is ambiguous. We are unpersuaded. Just because some people have difficulty understanding insurance policy language does not mean that the language is ambiguous—no more so than the well-intentioned, precise and unambiguous instructions for the latest computer software program which a middle-aged judge finds befuddling but a 15–year–old high school student finds simple and easy to follow. Moreover, it is for the court, not others, to determine whether contract language is ambiguous. *See Id.* at 606, 735 A.2d at 106 (holding "The polestar of our inquiry, therefore, is the language of the insurance policy.").

¶ 11 Second, Nordi asks us to examine the policy's Schedule of Copayments and Limitations and contrast inpatient service limitations with those for outpatient services. Amended Complaint, Exhibit A. The former express the limitation in terms of a maximum number of days per year or admission. Skilled nursing care, for example, is "limited to 90 days per calendar year." Outpatient service limitations, however, are expressed in terms of a maximum number of visits. Outpatient substance abuse treatment, for example, is "limited to 30 outpatient full-session visits." Nordi then concludes: "When every [ ] covered outpatient service [other than Nordi's occupational therapy] is described

with reference to a number of visits, it follows that outpatient occupational therapy services have a similar allowable visits limitation." Appellant's Brief at 11. We are not persuaded. As the trial court properly concluded, the disputed language clearly limited therapy treatment to a 60–day period beginning with the first treatment. The example regarding substance abuse treatment demonstrates Keystone knew how to express a limitation by reference to *visits* when it wanted to do so. It elected not do so with regard to therapy services.[2]

¶ 12 Accordingly, we hold the trial court did not err in concluding, as a matter of law, the disputed contract language was not ambiguous, and, as a result, Keystone, let alone Highmark, did not breach the health insurance contract.[3]

¶ 13 We next address Nordi's argument the trial court erred in granting summary judgment while failing to address Nordi's insurance "bad faith" and CPL causes of action.

¶ 14 Nordi's complaint alleges bad faith in Appellees' failure to provide coverage, investigate her claim, communicate with her, and attempt in good faith to effect a fair settlement.[4] She levels these allegations at both Keystone and Highmark. The bad faith statute provides:

---

**2.** Nordi implies there were many outpatient services whose limitations were expressed in terms of *visits*. However, there were only three—substance abuse treatment, mental health care services, and, of course, the outpatient therapy services. Amended Complaint, Exhibit A.

**3.** As we explain below, the fact Highmark was not literally a party to the health insurance contract does not necessarily foreclose the possibility it might be liable for any breach of contract, the same as though it were a party.

**4.** Nordi cites *March v. Paradise Mut. Ins. Co.*, 435 Pa.Super. 597, 646 A.2d 1254 (1994) to

establish a § 8371 bad faith action may be maintained independently of an underlying claim which has not been resolved or has been resolved unfavorably. In *March*, we held a "bad faith" action survived the dismissal of the underlying breach of an insurance contract action barred by the policy's one-year "limitations of actions" provision. We ruled, as we again rule in the present case, § 8371 "does not indicate that success on the bad faith claim is reliant upon the success of the contract claim." *Id.* at 601, 646 A.2d 1254.

### § 8371. Actions on Insurance Policies

In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.

(2) Award punitive damages against the insurer.

(3) Assess court costs and attorney fees against the insurer.

42 Pa.C.S.A. § 8371. This statutory remedy, however, does not apply to HMOs whose enabling legislation specifically exempts them from laws relating to insurance corporations:

### § 1560. Supervision

(a) Except as otherwise provided in this act, **a health maintenance organization operating under the provisions of this act shall not be subject to the laws of this State now in force relating to insurance corporations engaged in the business of insurance** nor to any law hereafter enacted relating to the business of insurance unless such law specifically and in exact terms applies to such health maintenance organization. For a health maintenance organization established, operated and maintained by a corporation, this exemption shall apply only to the operations and subscribers of the health maintenance organization.

40 P.S. § 1560 (emphasis added). HMO Act § 1560 insulates Keystone from laws like the bad faith statute which "relat[e] to insurance corporations engaged in the business of insurance." [5] In *DiGregorio v. Keystone Health Plan East*, 840 A.2d 361 (Pa.Super.2003), an action against an HMO for breach of contract and § 8371 bad faith, we confirmed this conclusion:

> Finally, under the alternative theory of common law bad faith presented in their complaint, Appellants are also precluded from recovering punitive damages. Since "bad faith" is not a recognized common law action in tort, Appellants cannot assert punitive damages on this basis. *See D'Ambrosio v. Pennsylvania National Mutual Casualty Insurance Co.*, 494 Pa. 501, 431 A.2d 966 (1981) (no common law remedy for bad faith claim against insurer); *Mishoe v. Erie Insurance Co.*, 762 A.2d 369, 375 n. 6 (Pa.Super.2000) (same). Moreover, Appellants cannot assert a statutory entitlement to punitive damages because Pennsylvania specifically exempts HMOs, such as Keystone, from statutory bad faith claims under 42 Pa.C.S. § 8371. *See* 40 P.S. § 1560. Thus, we find that Appellants had no cause of action for a claim for punitive damages, and the trial court property entered its order in favor of Keystone.

*Id.* at 370–71 (footnotes omitted).[6]

¶ 15 Nordi argues *DiGregorio* has been impliedly overruled by *Barber v. Unum Life Insurance Company of America*, 383 F.3d 134 (3d Cir.2004), an obviously non-

---

**5.** We may affirm the trial court on a ground different than that employed by the trial court. *Commonwealth v. Singletary*, 803 A.2d 769, 772–773 (Pa.Super.2002).

**6.** We acknowledge but disagree with Nordi's attempt to discount *DiGregorio's* § 8371 holding as dictum. The quoted passage from *DiGregorio* was necessary to its ultimate holding the plaintiff-appellants failed to state a sepa-

rate cause of action for punitive damages under a common law or § 8371 statutory law theory. *Id.* at 370–71. *See Wirth v. Aetna U.S. Healthcare*, 588 Pa. 313, 320, 904 A.2d 858, 862 (2006) (noting "The Superior Court in *DiGregorio held* that Section 1560 of the HMO Act protects HMOs from statutory bad faith claims.") (emphasis added).

precedential federal court decision, which held ERISA's [7] separate express preemption and conflict preemption provisions rendered § 8371's bad faith statute irrelevant in an action involving a group disability insurance policy. *Barber*, Nordi submits, stands for the proposition Pennsylvania's bad faith statute merely provides a remedy but does not regulate the business of insurance. Appellant's Reply Brief at 11. Nordi, in a non-sequitor, continues that "[b]ecause the purely remedial nature of the Pennsylvania bad faith statute does not **regulate** insurance for purposes of ERISA's savings clause, it similarly should not **relate** to the business of insurance for purposes of the HMO Act." Appellant's Reply Brief at 12 (emphasis added). Repeating the non-sequitor, Nordi urges us to "look to the *Barber* analysis and find that the bad faith statute does not relate to the business of insurance, and therefore is not superseded by Pennsylvania's HMO Act." *Id.* at 13.

¶ 16 Nordi blurs the distinction between the words "regulate" and "relate" to reach the erroneous conclusion that, because § 8371 does not "regulate" the insurance business, it is, therefore, not superseded by HMO Act § 1560(a)'s exemption for HMOs from laws "relating to insurance corporations engaged in the business of insurance."

¶ 17 That there is a world of difference between the two words is borne out by *Barber* itself. *Barber* pointed out the express preemption provision states ERISA "shall supersede any and all State laws insofar as they may now or hereafter **relate** to any employee benefit plan." 29 U.S.C. § 1144(a) (emphasis added). As the *Barber* court explained, ERISA, however, creates an exception by a savings clause:

In apparent tension, however, and reflecting its concern with limiting states' rights to **regulate** insurance, banking, or securities, Congress drafted a saving clause, ERISA § 514(b)(2)(A), that provides: "Except as provided in subparagraph (B), nothing in this title shall be construed to exempt or relieve any person from any law of any State which **regulates** insurance, banking, or securities." 29 U.S.C. § 1144(b)(2)(A).

*Barber*, 383 F.3d at 137 (emphasis added). The court held § 8371 **related** to employee benefit plans but did not **regulate** insurance. The court, relying on Supreme Court precedent, held "a statute 'regulates insurance' and satisfies the saving clause only if it (1) is 'specifically directed toward entities engaged in insurance' and (2) 'substantially affect[s] the risk pooling arrangement between the insurer and the insured.'" *Id.* at 141 (footnote omitted). Because § 8371 **related** to an employee benefit plan, ERISA preempted it, and because § 8371 did not **regulate** insurance, ERISA's savings clause did not avoid preemption. *Id.* at 142–43.

¶ 18 Because *Barber* does not overrule *DiGregorio*, we hold HMO Act § 1560 insulates Keystone from potential § 8371 liability.

¶ 19 Highmark, however, is not an HMO and remains potentially liable for bad faith damages if it is an "insurer" within the meaning of § 8371. Nordi relies on *Brown v. Progressive Ins. Co.*, 860 A.2d 493 (Pa.Super.2004) for the two-part definition of an "insurer":

There is no simple rule for determining who is the insurer for purposes of the bad faith statute. The question is necessarily one of fact, to be determined both by examining the policy documents

7. 29 U.S.C. §§ 1001–1461.

themselves, and by considering the actions of the company involved. Thus, we look at two factors: (1) the extent to which the company was identified as the insurer on the policy documents; and (2) the extent to which the company acted as an insurer. *See, Lockhart v. Federal Ins. Co.,* 1998 WL 151019, 1998 U.S. Dist. LEXIS 4046 (E.D.Pa. March 30, 1998). This second factor is significantly more important than the first factor, because it focuses on the true actions of the parties rather than the vagaries of corporate structure and ownership.

*Id.* at 498–99 (footnote omitted).

¶ 20 In addition to *Brown,* Nordi argues Highmark can be liable under the "participation theory" of liability. Our Supreme Court has summarized this theory:

Where the court pierces the corporate veil, the owner is liable because the corporation is not a bona fide independent entity; therefore, its acts are truly his. Under the participation theory, the court imposes liability on the individual as an actor rather than as an owner. Such liability is not predicated on a finding that the corporation is a sham and a mere alter ego of the individual corporate officer. Instead, liability attaches where the record establishes the individual's participation in the tortious activity. *See Donsco, Inc. v. Casper Corp.,* 587 F.2d 602, 606 (3d Cir.1978).

Pennsylvania law recognizes the participation theory as a basis of liability.

The general, if not universal, rule is that an officer of a corporation who takes part in the commission of a tort by the corporation is personally liable therefor; but that an officer of a corporation who takes no part in the commission of the tort committed by the corporation is not personally liable to third persons for such a tort, nor for the acts of other agents, officers or employees of the corporation in committing it, unless he specifically directed the particular act to be done or participated, or cooperated therein.

3A Fletcher, *Cyclopedia of the Law of Private Corporations* § 1137, p. 207 (perm. ed. rev. 1975). *Accord Chester–Cambridge B. & T. Co. v. Rhodes,* 346 Pa. 427, 433, 31 A.2d 128, 131 (1943); *Amabile v. Auto Kleen Car Wash,* 249 Pa.Super. 240, 250, 376 A.2d 247, 252 (1977); *Donsco, Inc. v. Casper Corp.,* 587 F.2d at 606; *Martin v. Wood,* 400 F.2d 310, 312 (3d Cir.1968) (applying Pennsylvania law).

*Wicks v. Milzoco Builders, Inc.,* 503 Pa. 614, 621–22, 470 A.2d 86, 89–90 (1983).

¶ 21 Even assuming Highmark might be potentially liable for bad faith conduct as a *de facto* insurer under *Brown* or as a participating tortfeasor under *Wicks,* Nordi cannot escape the fact neither Keystone nor Highmark were guilty of bad faith handling of her claim. We have defined bad faith for § 8371 purposes:

In the insurance context, the term bad faith has acquired a particular meaning:

Insurance. "Bad faith" on part of insurer is any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (*i.e.,* good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith.

Black's Law Dictionary 139 (6th ed. 1990) (citations omitted).

*Rottmund v. Continental Assurance Company,* 813 F.Supp. 1104, 1108–09 (E.D.Pa.1992)[.] Further, bad faith must be proven by clear and convincing evi-

dence and not merely insinuated. Finally, to recover under a claim of bad faith, the plaintiff must show that the defendant did not have a reasonable basis for denying benefits under the policy and that defendant knew or recklessly disregarded its lack of reasonable basis in denying the claim.

*Terletsky v. Prudential Property and Casualty Insurance Co.*, 437 Pa.Super. 108, 649 A.2d 680, 688 (1994) (most internal citations omitted). We have clarified *Terletsky*'s reference to motive of self-interest:

> This court concludes that the "motive of self-interest or ill will" level of culpability is not a third element required for a finding of bad faith, but is probative of the second element identified in *Terletsky, i.e.*, "the insurer knew or recklessly disregarded its lack of reasonable basis in denying the claim."

*Greene v. United Services Auto. Ass'n*, 936 A.2d 1178, 1190 (Pa.Super.2007) (internal citations omitted).

¶ 22 Given this definition of bad faith and the provision of therapy services over the contractually limited 60–day period, we hold the trial court did not commit an error of law or abuse its discretion in granting summary judgment for Highmark on the § 8371 bad faith cause of action. We, of course, extend this ruling to Keystone as well.

 ¶ 23 Nordi's final contention is the trial court also erred in entering judgment for Keystone and Highmark on her CPL cause of action. Nordi concedes misfeasance, not mere nonfeasance, is a required element of a CPL violation. Mere refusal to pay a claim, or failure to investigate or take other action, is nonfeasance and is, thus, not actionable. *Gordon v. Pa. Blue Shield*, 378 Pa.Super. 256, 548 A.2d 600, 604 (1988). Nordi argues Appellees' sale of a policy and enforcement of its 60–

day coverage limitation, known by them to be "confusing and ambiguous," constituted misfeasance. Appellant's Reply Brief at 23.

¶ 24 There, however, is no support in the record Appellees were guilty of such duplicitous conduct. Accordingly, we conclude the trial court did not err or abuse its discretion in granting summary judgment on Nordi's CPL claim.

¶ 25 For the foregoing reasons, we affirm the trial court's grant of summary judgment for Keystone and Highmark on the breach of contract, insurance bad faith, and CPL claims asserted by Nordi.

¶ 26 Order affirmed.