# Sharp v. Travelers Personal Security Insurance Co.

*Timothy G. Lenahan* and *Christine S. Lezinski*, for plaintiff.

*Brooks R. Foland* and *Corey J Adamson*, for defendant.

NEALON, *J.*, March 7, 2014—The insured and insurer have both filed *de novo* discovery appeals in this first-party medical expense benefits case in which the insured has asserted causes of action for breach of contract and violations of the Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201-1 *et seq.* The parties' cross-appeals concern the discovery of the insurer's loss reserves for the insured's claims, its underinsured motorist (UIM) claim file for the insured, the insurer's claims practices manuals, the personnel files for certain adjusters of the insurer, a compilation of other peer reviews requested by the insurer, other lawsuits and insurance department complaints pertaining to medical expense benefits claims against the insurer under insurance policies with coverage limits of $100,000.00 or more, records of payments made to the health care professionals who conducted any peer reviews in this matter, and materials generated by the insurer after the insured's medical expense benefits claim was initially closed by the insurer.

Since the insured has not asserted an independent claim for bad faith liability against the insurer, its reserves information is protected from discovery as opinion work product and the personnel files of its claims representatives are not discoverable under the heightened standard of relevance applicable to such requests. Nor is the insurer's closed UIM claim file for the insured relevant to any issues raised in this case. The insurer's 2009-2010 claims practices manuals and training materials concerning the handling

of medical expense benefits claims are relevant to the insured's allegations that the insurer violated the UTPCPL by engaging in deceptive practices and committing actionable malfeasance by abusing the peer review process and proper medical examination procedures, and that treble damages are warranted under the UTPCPL since the insurer acted intentionally or recklessly in that regard. For the same reasons, the insurer is required to provide the requested documents and information relating to (a) other litigation and administrative complaints filed against the insurer involving medical expense benefits claims where the insured's coverage limits were $100,000.00 or more, (b) peer reviews initiated by the insurer in cases with such coverage limits, and (c) payments made to the health care professionals who conducted peer reviews of the insured's treatment. As a condition to that discovery, the insured will be required to execute a confidentiality agreement with respect to any proprietary information or trade secrets reflected in the insurer's claims manuals, training materials, and vendor agreements with peer reviewers, and the insurer may redact the identities of the insureds who filed administrative complaints with the Insurance Commissioner. Finally, the insurer will be directed to submit all post-initial file closure materials to the special discovery master for an *in camera* review and determination as to whether those documents are protected from discovery as opinion work product.

## I. FACTUAL BACKGROUND

On February 13, 2009, plaintiff, Rowland Sharp ("Sharp"), was involved in a motor vehicle accident

on Route 92, Susquehanna County, while operating an automobile which was insured by defendant, Travelers Personal Security Insurance Company ("Travelers"). (Docket entry no. 1 at ¶¶ 16-17, 19-20; Docket entry no. 11 at ¶¶ 16-17, 19-20). Sharp sustained personal injuries in the accident for which he received treatment from his family physician, Terrence Chilson, M.D., and two chiropractors, Michele L.Pavelski, D.C., and Gerald D. Evans, D.C. (*Id.* at ¶¶ 16,33,81). Sharp's policy with Travelers provides first party medical expense benefits coverage up to $100,000.00. (*Id.* at ¶ 18).

On April 2, 2009, Sharp's original counsel notified Travelers' claims representative of his representation of Sharp. (*Id.* at ¶ 38). Sharp contends that on the following day, Travelers retained Professional Dynamics Inc. to conduct a peer review of the chiropractic treatment of Dr. Pavelski.[1] (*Id.* at ¶ 39). On May 5, 2009, June 4,

---

1. Under Section 1797(b)(1) of the Motor Vehicle Financial Responsibility Law ("MVFRL"), an insurer may contract with a peer review organization ("PRO") "for the purpose of evaluating treatment, health care services, products or accommodations provided to any injured person" and "confirming that such treatment, products, services or accommodations conform to the professional standards of performance and are medically necessary." 75 Pa.C.S.A. § 1797(b)(1). "The peer review process is a mechanism through which an insurer may seek a professional assessment of the reasonableness and necessity of medical treatment in order to independently determine whether a claim whould be paid or denied." *Terminato v. Pennsylvania Nat. Ins.Co.*, 538 Pa. 60, 71, 645 A.2d 1287, 1292 (1994). If the PRO determines "that a provider has provided unnecessary medical treatment...or that future provision of such treatment...will be unnecessary,...the provider may not collect payment for the medically unnecessary treatment..." 75 Pa.C.S.A. § 1797(b)(7). Conversely, if the PRO concludes that the treatment provided was medically necessary, "the insurer must pay to the provider the outstanding amount plus interest at 12% per year on any amount withheld by the insurer pending PRO review." 75 Pa.C.S.A. § 1797(b)(5).

2009, and July 2, 2009, Amy Fern Schensul, D.C., of Professional Dynamics Inc. furnished three separate reports to Travelers in which she concluded that Sharp was responding positively to his chiropractic treatment, that Sharp's chiropractic treatment to date was "appropriate and warranted," and that additional chiropractic treatment was both "necessary and warranted." (*Id.* at ¶¶ 42-44).

Travelers did not inform Sharp or his counsel of Dr. Schensul's three peer review reports which found that Sharp's chiropractic treatment was reasonable and necessary and that further chiropractic treatment was indicated. (*Id.* at ¶¶ 53-54). Instead, on July 28, 2009, Travelers notified Sharp that the chiropractic records and bills of Dr. Pavelski and Dr. Evans were being forwarded to a PRO to determine if that treatment was reasonable and necessary, and Travelers thereafter forwarded those bills to Jess P. Armine, D.C., for his review. (*Id.* at ¶¶ 46-47). On September 10, 2009, Dr. Armine authored a report in which he opined that any chiropractic care provided after April 15, 2009, was not reasonable and necessary. (*Id.* at ¶¶ 47,49). On September 15, 2009, Travelers mailed a copy of Dr. Armine's report to Dr. Pavelski, Dr. Evans and Sharp's original counsel, and advised them that Travelers would not pay for any chiropractic care provided after April 15, 2009. (*Id.* at ¶¶ 49,51,56).

Less than one month later, Travelers retained MES Solutions on October 10, 2009, in an effort to schedule a medical examination of sharp.[2] (*Id.* at ¶¶ 65, 67).

---

2. Unlike a peer review under 75 Pa.C.S.A. § 1797 which is designed "to determine whether medical care and bills are reasonable

On November 16, 2009, Travelers and MES Solutions scheduled an examination of Sharp by Paul Shipkin, M.D., Warminster, Pennsylvania, on December 30, 3009. (*Id.* at ¶ 69). However, on November 24, 2009, Travelers and MES Solutions advised Sharp that his medical examination had been rescheduled to be performed by Beth Cohen, M.D., Stroudsburg, Pennsylvania, on December 22, 2009, at 2:00 PM. (*Id.* at ¶ 70). Sharp traveled 154 miles round trip to the examination by Dr. Cohen on December 22, 2009, only to be informed at 1:50 PM that the examination had been cancelled by Dr. Cohen. (*Id.* at ¶ 71).

By letter dated January 8, 2010, Travelers informed Sharp that his medical examination would be conducted by another physician, and that the examination would be unilaterally scheduled by Travelers unless Sharp notified Travelers by January 13, 2010, of "any days during the week that would not be convenient" for him. (*Id.* at ¶ 72). On January 27, 2010, Travelers' unit manager demanded that Sharp furnish Travelers with prospective dates and times for a medical examination, and indicated that Travelers would discontinue payment of his first party benefits if Sharp did not provide convenient dates and times by February 1, 2010. (*Id.* at ¶ 73). On March 8, 2010, Travelers forwarded a letter to Sharp stating that it would not pay any medical bills incurred after January 15, 2010, due to Sharp's "noncompliance" in scheduling

---

and necessary based upon a records review," a medical examination "subjects a person to a physical or mental examination, the purpose of which is to determine whether the injuries are causally related to the accident." *Levine v. Travelers Property Casualty Insurance Company*, 69 A.3d 671, 679 (Pa. Super. 2013). Hence, a medical examination "is an entirely different process pursued for a different purpose." *Id.*

his examination. (*Id.* at ¶ 74). It is undisputed that, prior to discontinuing payment of Sharp's medical expense benefits as of January 15, 2010, Travelers did not petition a court to compel a medical examination of Sharp pursuant to 75 Pa.C.S.A. § 1796, nor did it submit the medical bills of Sharp's family physician, Dr. Chilson, to a PRO for a peer review.[3] (*Id.* at ¶¶ 76, 81, 82).

After Sharp retained his current counsel in 2012, (Docket entry no. 1 at ¶ 54), he commenced this action against Travelers on November 1, 2012, asserting causes of action for breach of contract, violations of the MVFRL and the Uniform Trade Practices and Consumer Protection Law (UTPCPL), 73 P.S. § 201-1 *et seq.*, and "Vicarious Liability." (*Id.* at ¶¶ 99-132). Sharp maintains

---

3. Section 1796(a) of the MVFRL states that "[w]henever the mental or physical condition of a person is material to any claim for medical...benefits, a court of competent jurisdiction may order the person to submit to a mental or physical examination by a physician," provided, however, that "[t]he order may only be made upon motion for good cause shown." 75 Pa.C.S.A. § 1796(a). Under the "good cause shown" standard, a motion under Section 1796 "will not be granted solely because there is a controversy or a desire to know," and "[t]he good cause requirement will prevent harassment, untoward intrusion and unwarranted examination when the proof presented does not meet the standard universally applied when good cause is implicated." *State Farm Ins. Companies v. Swantner*, 406 Pa. Super. 235, 245, 248, 594 A.2d 316, 321, 322 (1991) (*en banc*), *app. denied*, 530 Pa. 633, 606 A.2d 903 (1992). However, "[i]f the insurance policy between the insurer and insured requires the insured to 'submit to a physical examination by a physician of [the insurer's] choice,' the first-party benefits insurer does not have to establish 'good cause' under Section 1796 as a condition precedent to compelling the insured to undergo a medical examination." *Olsofsky v. Progressive Insurance Company*, 52 Pa. D. & C. 4th 449, 478 n. 2 (Lacka. Co. 2001) (citing *Fleming v. CNA Insurance Companies*, 409 Pa. Super. 285, 288-289, 597 A.2d 1206, 1207-1208 (1991)). The record submitted for review does not indicate whether Travelers' policy imposed a duty upon Sharp to submit to a medical examination by a physician chosen by Travelers, without the necessity of first demonstrating "good cause" for that examination.

that Travelers abused the peer review process by denying payment of chiropractic bills following its receipt of Dr. Schensul's three reports, and by refusing to pay the bills of a physician, Dr. Chilson, based upon a chiropractic peer review. (*Id.* at ¶¶ 83, 85,95). Sharp accuses Travelers of adopting "an improper policy and practice to...devise ways to deny coverage" for insureds with a "higher amount of first party benefits" coverage, such as Sharp's "$100,000.00 in first party medical benefits." (*Id.* at ¶ 92). Sharp also charges Travelers with misuse of peer review procedures and medical examinations "for an improper purpose, namely, in the hope of obtaining results to influence the claim for underinsured motorist benefits" that Sharp was presenting under his policy with Travelers. (*Id.* at ¶ 93).

Sharp's complaint contains a litany of allegations of misconduct by Travelers in connection with its handling and consideration of Sharp's claims for medical expense benefits. (*Id.* at ¶ 95(a)-(xx)). Included among those allegations is Sharp's assertion that Travelers breached its implied duty of "good faith and fair dealing" under the insurance policy. (*Id.* at ¶¶ 95(v), 96, 102-104, 111). Sharp demands payment of his unpaid medical and chiropractic bills, as well as 12% interest on those benefits, and recovery of counsel fees and expenses pursuant to Sections 1716 and 1798 of the MVFRL, 75 Pa.C.S.A. §§ 1716, 1798. (*Id.* at ¶¶ 87, 95, 117-121). Sharp does not assert a claim for first party bad faith liability under 42 Pa.C.S.A. § 8371, presumably due to the fact that his present counsel was not retained, and this action was not filed, within two years of

the date of Travelers' alleged misconduct and denial of medical expense benefits. *See Ash v. Continental Ins. Co.*, 593 Pa. 523, 536, 932 A.2d 877, 885 (2007) (holding that "an action under § 8371 is a statutorily-created tort action and...is subject to the two-year statute of limitations under 42 Pa.C.S. § 5524").

Sharp served 101 interrogatories and 75 requests for production of documents upon Travelers, which asserted twenty-five objections to the interrogatories and forty-nine objections to the requests for production. (Docket entry no. 33 at p. 2). Sharp presented a discovery motion to the special discovery master on September 23, 2013, (Docket entry nos. 22-24), and on November 7, 2013, the discovery master issued an order addressing Travelers' objections, only eight of which are relevant to these appeals. (Docket entry no. 25). The discovery master sustained Travelers' objection to Sharp's request for Travelers' "reserve information" pertaining to Sharp's first-party benefits claim and underinsured motorist (UIM) claim. (*Id.* at p.1). The master overruled Travelers' objections to the following seven items of discovery: (1) Travelers' file concerning Sharp's UIM claim; (2) Travelers' "claims and policy manuals" and "educational and training materials" regarding the handling of first-party benefits claims "insofar as they were in place at the time of the adjustment" of Sharp's claim; (3) the "personnel files of each adjuster" who handled Sharp's first-party benefits claim, "with the appropriate redaction of personal, private and protected information;" (4) "information regarding any and all Pennsylvania

lawsuits and/or formal Pennsylvania Insurance Department complaints filed against [Travelers]" between February 13, 2004, and February 13, 2009, "involving claims for first-party medical expense benefits, where the policies provide coverage in the amount of $100,000.00 or more;" (5) "a list of claims in which utilization reviews and/or peer reviews were performed by or at the request of [Travelers] in Pennsylvania between February 13, 2004, and February 13, 2009, but only where the insurance policies in those cases provided for first-party benefits in the amount of $100,000.00 or more;" (6) "any payments made directly by [Travelers] to any physicians or other medical specialists who peer reviewed, performed a utilization review of, or otherwise reviewed, the first-party benefits claim" of Sharp; and (7) "all documents contained within the claim file created, prepared and/or generated after [Sharp's] claim was formally closed" by Travelers. (*Id.* at pp. 1-4).

On November 15, 2013, Sharp and Travelers both filed *de novo* appeals of the special discovery master's ruling.[4] (Docket entry nos. 27, 29). The parties submitted their respective memoranda of law on December 6, 2013, and December 30, 2013, and oral argument was conducted on January 10, 2014. (Docket entry nos. 32-33, 35-36). The parties' discovery appeals are now ripe for disposition.

## II. DISCUSSION

---

4. Under Lacka. Co. R.C.P. 4000.1, all discovery motions must initially be presented to and decided by the court-appointed discovery master whose ruling "may be appealed *de novo*" to the court of common pleas within ten days of the master's decision. *Fratzola v. Klepadlo*, 26 Pa. D. & C. 5th 533, 537-538 (Lacka. Co. 2012).

## (A) STANDARD OF REVIEW

Under Pa.R.C.P. 4003.1, "discovery is liberally allowed with respect to any matter, not privileged, which is relevant to the cause being tried." *Berg v. Nationwide Mutual Insurance Company. Inc.*, 44 A.3d 1164, 1178 n. 8 (Pa. Super. 2012), *app. denied*, 65 A.3d 412 (Pa. 2013). Information is relevant "if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact." *Kelin v. Aronchick*, 2014 WL 46648, at * 9 (Pa. Super. 2014); *Smith v. Morrison*, 42 A.3d 131, 137 (Pa. Super. 2012), *app. denied*, 57 A.3d 71 (Pa. 2012).

The relevancy standard applicable to discovery is necessarily broader than the standard used at trial for the admission of evidence. *Com. v. TAP Pharmaceutical Products, Inc.*, 904 A.2d 986, 994 (Pa. Cmwlth. 2006); *George v. Schirra*, 814 A.2d 202, 205 (Pa. Super. 2002). The party objecting to discovery generally bears the burden of establishing that the requested information is not relevant or discoverable. *Koken v. One Beacon Insurance Company*, 911 A.2d 1021, 1025 (Pa. Cmwlth. 2006); *Yadouga v. Cruciani*, 66 Pa. D. & C. 4th 164, 168 (Lacka. Co. 2004). Any doubts regarding relevancy are to be resolved in favor of discovery. *Ario v. Deloitte & Touche, LLP*, 934 A.2d 1290, 1293 (Pa. Cmwlth. 2007).

## (B) RELEVANT THEORIES OF LIABILITY

In addition to demanding the payment of medical and chiropractic expenses under the policy's first-party

benefits coverage, together with 12% interest on those unpaid benefits, Sharp seeks to recover counsel fees and expenses under Sections 1716 and 1798 of the MVFRL.[5] An insurer must pay reasonable attorney fees to the insured under Section 1716 if "the insurer is found to have acted in an unreasonable manner in refusing to pay the benefits when due." 75 Pa.C.S.A. § 1716. Under this standard, "[a]n insurer will be held liable for the reasonable attorney fees incurred by the insured when the insurer's failure to pay a claim constitutes an unreasonable act which is clearly contrary to the terms of the policy and the Pennsylvania law." *Rimpa v. Erie Ins. Exchange*, 404 Pa. Super. 287, 297, 590 A.2d 784, 790 (1991).

Section 1798(b) similarly provides that "[i]n the event an insurer is found to have acted with no reasonable foundation in refusing to pay the benefits...when due, the insurer shall pay, in addition to the benefits owed and the interest thereon, a reasonable attorney fee based upon actual time expended." 75 Pa.C.S.A. § 1798(b). For example, an insurer's "decision to rely upon the reports of

---

5. Sharp also charges Travelers with breach of the implied covenant of "good faith and fair dealing" under the insurance contract. (Docket entry no. 1 at ¶¶95(v), 96, 102-103, 111). Under Pennsylvania law, a "claim for breach of the implied covenant of good faith and fair dealing is subsumed in a breach of contract claim," *LSI Title Agency, Inc. v. Evaluation Services. Inc.*, 951 A.2d 384, 392 (Pa. Super. 2008), *app. denied*, 599 Pa. 694, 960 A.2d 841 (2008), and for that reason, this Commonwealth does not recognize an independent cause of action for breach of the implied duty of good faith and fair dealing. *See Stewart v. Swepi*, LP, 918 F.Supp.2d 333, 343-344 (M.D. Pa. 2013); *Zaloga v. Provident Life & Accident Ins. Co.*, 671 F.Supp.2d 623,631 (M.D. Pa. 2009); *Healey v. Wells Fargo. N.A.*, 2012 WL 994564, at * 20 (Lacka. Co. 2012). Therefore, Sharp's allegations regarding the implied covenant of good faith and fair dealing are only germane to his breach of contract claim.

its own doctors...in the face of the overwhelming contrary evidence showing [the insured's] actual need for continuing treatment, can easily be seen as having no reasonable foundation" under Section 1798(b) of the MVFRL. *Hill v. Nationwide Insurance Company*, 391 Pa. Super. 184, 196, 570 A.2d 574, 580 (1990), *app. denied*, 525 Pa. 647, 581 A.2d 573 (1990). In contrast, in order to establish that an insurer "acted in bad faith toward the insured" in contravention of 42 Pa.C.S.A. § 8371, an insured must not only show, by clear and convincing evidence, that "the insurer did not have a reasonable basis for denying benefits under the policy," but must further prove "that the insurer knew of or recklessly disregarded its lack of reasonable basis in denying the claim." *Grossi v. Travelers Personal Ins. Co.*, 79 A.3d 1141, 1148 (Pa. Super. 2013) (citing *Terletsky v. Prudential Property and Cas. Ins. Co.*, 427 Pa. Super. 108, 125, 649 A.2d 680, 688 (1994), *app. denied*, 540 Pa. 641, 659 A.2d 560 (1995)). Thus, the burden of proof governing the recovery of counsel fees under Sections 1716 and 1798(b) of the MVFRL is less demanding than the quantum of proof required to establish "bad faith" standard under 42 Pa.C.S.A. § 8371. *Olsofsky*, 52 Pa. D. & C. 4th at 459-460.

In Count III of the complaint, Sharp also advances a private cause of action under the UTPCPL for alleged "unfair or deceptive business practices" by Travelers. *See Lesoon v. Metropolitan Life Insurance Company*, 898 A.2d 620, 627 (Pa. Super. 2006) ("This court has repeatedly observed that the UTPCPL is governed by a six-year statute of limitations"), *app. denied*, 590 Pa.

678, 912 A.2d 1293 (2006). Sharp alleges that Travelers made a series of "misrepresentations" upon which Sharp "justifiably relied" to his detriment. (Docket entry no. 1 at ¶¶ 125-126). Those alleged misrepresentations included Travelers' "wholly illusory" representation that Sharp had "purchased $100,000.00 in first party benefits," "charging a premium" for those benefits "when, in fact, defendant Travelers would use any excuse or rationale, justified or not, to avoid fulfilling the contract," "causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods" and "the affiliation, connection or association with, or certification by, another," "advertising goods or services with intent not to sell them as advertised," and "engaging in fraudulent or deceptive conduct, which created likelihood of confusion or of misunderstanding."[6] (*Id.* at ¶ 124(a)-(k)).

The UTPCPL is designed "to protect the public from unfair or deceptive business practices," *Dearmitt v. New York Life Ins. Co.*, 73 A.3d 578, 591 (Pa. Super. 2013), and Section 9.2 of the act provides a private cause of action for any person who "suffers any ascertainable loss of money or property" as a result of an "unlawful" method, act or practice under the Act. 73 P.S. § 201-9.9.2(a). Section 2(4)

---

[6]. Travelers filed a demurrer to Sharp's UTPCPL claim on the basis that Sharp merely "alleges failure to pay and properly administer [Sharp's] claim for first-party medical benefits, which constitutes nonfeasance, and the UTPCPL does not apply to alleged failures by insurers to pay benefits, regardless of the fanciful language used to bolster the allegations of the complaint." (Docket entry no. 4 at ¶ 12). On March 20, 2013, the parties executed a stipulation pursuant to which Travelers agreed to withdraw that preliminary objection without prejudice to its "right to file a motion for summary judgment with regard to [Sharp's] Unfair Trade Practices and consumer protection law claims." (Docket entry no. 9 at ¶ 5).

of the UTPCPL "lists twenty enumerated practices which constitute actionable 'unfair methods of competition' or 'unfair and deceptive acts or practices,'" including a catchall provision in Section 2(4)(xxi) which proscribes any "fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." *Bennett v. A. T. Masterpiece Homes at Broadsprings, LLC*, 40 A.3d 145, 154 (Pa. Super. 2012) (quoting 73 P.S. § 201-2(4)(xxi)); *Healey, supra*, at * 15. In the context of insurance claims, federal courts have interpreted the UTPCPL as creating private causes of action only for "malfeasance, the improper performance of a contractual obligation," and have reasoned that "an insurer's mere refusal to pay a claim which constitutes nonfeasance, the failure to perform a contractual duty, is not actionable." *Horowitz v. Federal Kemper Life Assurance Co.*, 57 F.3d 30, 307 (3d Cir. 1995); *Schlegel v. State Farm Mutual Automobile Insurance Company*, 2013 WL 4041848, at * 6 (M.D. Pa. 2013). *Accord, Klinger v. State Farm Mutual Automobile Insurance Company*, 895 F.Supp. 709,717 (M.D. Pa. 1995) ("It is well established that an insurer's refusal to pay benefits to an insured is nonfeasance, and not actionable under the UTPCPL"). However, at least one federal court has distinguished those cases and held that an insurer, which "intentionally submitted [the insured's] medical bills to a biased PRO knowing that it would receive a determination as to the reasonableness and necessity of treatment which would allow it to deny [the insured's] claims," is chargeable with "improper performance sufficient to state the type of malfeasance prohibited by the UTPCPL." *Perkins v. State Farm Insurance Company*,

589 F.Supp.2d 559, 567 (M.D. Pa. 2008).

Successful claimants may "recover actual damages" under the UTPCPL, Dearmitt, 73 A.3d at 593, and "the court may, in its discretion, award up to three times the actual damages sustained," together with "costs and reasonable attorney fees." 73 P.S. § 201-9.2(a). Pursuant to their authority to fashion an appropriate damages multiplier, trial courts possess the discretion under the UTPCPL to award double damages rather than treble damages. *Bennett*, 40 A.3d at 156. In deciding whether to award double or treble damages, the court "should focus on the presence of intentional or reckless, wrongful conduct, as to which an award of treble damages would be consistent with, and in furtherance of, the remedial purposes of the UTPCPL." *Schwartz v. Rockey*, 593 Pa. 536, 557, 932 A.2d 885, 898 (2007); *Pasqualini v. Altieri Enterprises, Inc.*, 2010 WL 28655, at * 5 (M.D. Pa. 2010).

Based upon the foregoing, the relevant issues in this case are: (1) whether Travelers breached its express or implied duties under the insurance contract by failing to pay Sharp's medical and chiropractic expenses; (2) whether Travelers "acted in an unreasonable manner in refusing to pay" those benefits by acting "clearly contrary to the terms of the policy," or "acted with no reasonable foundation in refusing to pay" the benefits; and (3) whether Travelers committed "malfeasance" in the performance of its contractual obligations, and if so, whether it engaged in "intentional or reckless, wrongful conduct" in the process, thereby warranting an award of treble damages. However, since Sharp has not asserted a timely claim for bad faith

liability under 42 Pa.C.S.A. § 8371, it is immaterial whether Travelers "knew of or recklessly disregarded its lack of a reasonable basis in denying" Sharp's claim for medical expense benefits.[7] Therefore, the discovery sought by Sharp must be relevant to the three theories of potential liability itemized above.

## (C) RESERVE INFORMATION FOR MEDICAL EXPENSE BENEFITS AND UIM CLAIMS

Sharp's discovery appeal concerns his interrogatory nos. 29 and 30 and requests for production of documents nos. 7,66 and 67 seeking information pertaining to Travelers' insurance reserves for Sharp's medical expense benefits and UIM claims. Pennsylvania law requires insurance companies to set aside reserves upon notice of potential claims under their policies, *see* 40 P.S. §§71, 71.1, 73, 92, 112, 115, 151, 156, in order to "ensure that insurance companies are able to pay once liability is established or

---

7. In discussing insurer bad faith under Section 8371, the Supreme Court of Pennsylvania "has stated the bad faith insurance statute is concerned with the duty of good faith and fair dealing." *Ash*, 593 Pa. at 532, 932 A.2d at 883. Although, "it is not necessary that the refusal to pay be fraudulent" in order to constitute bad faith, *Grossi*, 79 A.3d at 1148-1149, "mere negligence or bad judgment is not bad faith." *Berg*, 44 A.2d at 1172. Rather, the insured must show "that the insurer breached a known duty (i.e., the duty of good faith and fair dealing) through a motive of self-interest or ill will." *Grossi*, 79 A.3d at 1149; *Berg, supra.* The "motive of self-interest of ill will" level of culpability "is not a third element required for a finding of bad faith, but is probative of the second element identified in *Terletsky*, i.e., 'the insurer knew or recklessly disregarded its lack of a reasonable basis in denying the claim.'" *Nordi v. Keystone Health Plan West, Inc.*, 989 A.2d 376, 385 (Pa. Super. 2010) (quoting *Greene v. United Services Auto. Ass'n*, 936 A.2d 1178, 1190 (Pa. Super. 2007)). The insurer's bad faith must be established "by clear and convincing evidence." *Johnson v. Progressive Insurance Company*, 987 A.2d 781,784 (Pa. Super. 2009); *Rutkowski v. Allstate Insurance Company*, 69 Pa. D. & C. 4th 10, 36(Lacka. Co. 2004).

settlement is reached." *Fidelity & Deposit Co. of Maryland v. McCulloch*, 168 F.R.D. 516, 525 (E.D. Pa. 1996). The requirement of reserves also enables the Pennsylvania Insurance Department to monitor the financial condition of insurance companies for the protection of insureds and consumers. *North River Ins. Co. v. Greater New York Mutual Ins. Co.*, 872 F.Supp. 1411, 1412 (E.D. Pa. 1995); *Executive Risk Indemnity Inc. v. Cigna Corp.*, 81 Pa. D. & C. 4th 410, 419 (Phila. Co. 2006).

Reserves represent "the insurer's own estimate of the amount which the insurer could be required to pay on a given claim," and "the criteria used to set them vary widely depending upon the company and the type of insurance." *Mirarchi v. Seneca Specialty Insurance Company*, 2011 WL 2982401, at * 2 (E.D. Pa. 2011). Some courts have noted a "tenuous link between reserves and actual liability given that numerous considerations factor into complying with this statutory directive." *Fidelity & Deposit Co.*, 168 F.R.D. at 525 (citing *Rhone-Poulenc Rorer, Inc. v. Home Indemnity Co.*, 139 F.R.D. 609, 613 (E.D. Pa. 1991)). In the only appellate precedent addressing the discoverability of insurance reserve information, the Superior Court of Pennsylvania concluded that "[i]nsurance reserves, by their very nature, 'are prepared in anticipation of litigation, and consequently, are protected from discovery as opinion work product.'" *PECO Energy Co. v. Insurance Co. of North America*, 852 A.2d 1230, 1234 (Pa. Super. 2004) (quoting *Rhone-Poulenc Rorer*, 139 F.R.D. at 614). Characterizing insurance reserves information as non-discoverable work product under

Pa.R.C.P. 4003.3, the Superior Court "reverse[d] the trial court's order with respect to reserves information." *Id.* at 1235. *See also American and Foreign Insurance Company v. Jerry's Sports Center, Inc.*, 2005 WL 6399318, at * 2 (Susq. Co. 2005) ("Courts in Pennsylvania have ruled that information regarding reserves is not discoverable because information regarding reserves constitutes privileged information and work product that is prepared in anticipation of litigation").

Several trial courts, including this court, have reasoned that insurance reserves are discoverable in bad faith litigation against insurers, where liability for the underlying claim has already been established, since such information may be relevant to the issue of whether the insurer acted in bad faith in failing to settle or pay the original claim. *See Consugar v. Nationwide Insurance Co. of America*, 2011 WL 2360208, at * 5 (M.D. Pa. 2011) ("Since plaintiff here claims that defendant acted in bad faith, a comparison between the reserve value of the claim and defendant's actions in processing plaintiff's claim could shed light on defendant's potential liability"); *North River Ins. Co.*, 872 F.Supp. at 1412 (finding reserve information "relevant to the question of whether or not [the insurer] acted in bad faith during the pre-trial settlement negotiations"); *McAndrew v. Donegal Mutual Ins. Co.*, 56 Pa. D. & C. 4th 1, 18 (Lacka. Co. 2002); *Fretz v. Mutual Benefit Ins. Co.*, 37 Pa. D. & C. 4th 173, 180 (Alleg. Co. 1998). Other courts have concluded that insurance reserves are not discoverable in bad faith actions against insurers. *See Safeguard Lighting System v. American Specialty Ins.*

*Co.*, 2004 WL 3037947, at * 3 (E.D. Pa. 2004); *Fidelity & Deposit Co.*, 168 F.R.D. at 525 ("We fail to see how compelling production of reserve information would bring Ivey any closer to proving bad faith on Fidelity's part"); *Ciccone v. Allstate Ins. Co.*, 49 Pa. D. & C. 4th 505, 510 (Monroe Co. 2000). In *Mirarchi*, the federal district court did not permit discovery of the actual reserve amount, but in finding that "the facts considered in setting the reserve amount may potentially be relevant to Mr. Mirachi's bad faith claim," nonetheless required the insurer "to produce unredacted copies of the non-privileged documents...for *in camera* inspection to the extent that those documents contain information other than specific amounts set for loss reserves" which may reflect "the facts considered in setting the reserve amount." *Mirarchi, supra* at * 3. No Pennsylvania court has permitted discovery of insurance reserves in litigation not involving a bad faith liability claim against an insurer. *See, e.g., Executive Risk Indemnity Inc.*, 81 Pa. D. & C. 4th at 419-420 ("Reserve information can be discoverable if relevant to an issue presented in a bad faith action.... These bad faith claims do not exist in this case.... The issue presented in this case is whether Executive Risk's denial was based on a reasonable interpretation of the insurance policy. The amount established as reserves does not demonstrate that the insurer expected such claims to be covered by the policy.... The reserve information requested is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence").

Sharp contends that Travelers' loss reserve for his "first

party benefits claim may reflect that Travelers refused to honor [his] chiropractic bills for an ulterior purpose," to wit, "due to inadequately reserving for medical bills despite [Sharp's] $100,000 first party policy, or that defendant Travelers never intended to pay this high value first party policy and devised a way to deny coverage based on a peer review after the previous utilization/peer reviewer retained by defendant Travelers had deemed treatment reasonable and necessary." (Docket entry no. 33 at p. 7). Sharp similarly posits that reserve information for his concluded UIM claim is relevant to his argument that "Travelers submitted [Sharp's] claim for utilization review and peer review to influence [Sharp's] UIM claim." (*Id.*). Noting that Sharp has not asserted a bad faith claim in this case, Travelers replies that "Sharp has not directed the court to any case law in which the production of reserve information was compelled where a plaintiff's claims did not include statutory bad faith." (Docket entry no. 35 at p. 4). Travelers submits that Sharp's discovery appeal is simply "an attempt to gain licensure to engage in continued fishing expeditions into the pond of reserve information" (*Id.*).

Since Sharp has not presented a first party bad faith claim against Travelers based upon its handling of Sharp's medical expense benefits and UIM claims, Travelers' loss reserves information for those claims remains protected from discovery as opinion work product. *See PECO Energy Company*, 852 A.2d at 1234-1235. Sharp argues that his assertion of breaches of the implied duties of good faith and fair dealing transforms his breach of contract

claim into a cause of action for "common law bad faith." (Docket entry no. 33 at p. 10). However, an insured's assertion of a breach of an implied contractual duty of good faith in connection with a breach of contract claim is not tantamount to a cause of action for first party bad faith liability since those two theories involve "discrete" duties and "an action under § 8371 is distinct from the common law cause of action for breach of the contractual duty of good faith." *Ash*, 593 Pa. at 535, 932 A.2d at 884. Furthermore, as noted in n. 5, *supra*, Pennsylvania does not recognize an independent cause of action for breach of the implied covenant of good faith and fair dealing, and Sharp's allegations in that respect are subsumed in his breach of contract claim. If insureds were permitted to assert cognizable first party bad faith claims by simply alleging a breach of the implied duty of good faith in conjunction with their contract claims which are subject to a four year statute of limitations period, *see* 42 Pa.C.S.A. § 5525(a)(8), they would be allowed to circumvent the two year statute of limitations which the Supreme Court of Pennsylvania has established for first-party bad faith liability claims. *See Ash*, 593 Pa. at 536, 932 A.2d at 885.

Because Sharp has not filed a separate claim for bad faith liability in this case, Travelers' reserve information is not relevant or discoverable. As a result, Travelers' objections to that discovery will be sustained, and Sharp's *de novo* discovery appeal will be denied.

(D) TRAVELERS' UIM CLAIM FILE

In its discovery appeal, Travelers first challenges the discovery master's order requiring it to produce its file

relative to Sharp's UIM claim. Since this suit relates to Travelers' denial of Sharp's claim for medical expense benefits, Travelers submits that "[i]nformation contained in Sharp's UIM file would not be likely to lead to the discovery of admissible evidence." (Docket entry no. 32 at p. 6). Sharp maintains that the UIM claim file is relevant to his allegation that Travelers "performed peer reviews on the first party [medical expense benefits] claim in an attempt to force [Sharp's] health care providers to stop treatment" so as to adversely affect the value of his UIM claim. (Docket entry no. 36 at pp. 8-9). It bears noting that Sharp's UIM claim against Travelers has been concluded and is no longer pending. (*Id.* at p. 9).

"Evidence is relevant if it tends to prove or disprove a material fact." *Schuenemann V. Dreemz, LLC*, 34 A.3d 94, 101 (Pa. Super. 2011). The record submitted by the parties does not suggest that information or material contained in the UIM file could conceivably indicate that Travelers conducted peer reviews of Sharp's medical and chiropractic bills in an intentional and concerted effort to negatively impact his UIM claim. *Compare Robertson v. Allstate Insurance Company*, 1999 WL 179754, at * 6 (E.D. Pa. 1999) ("Allstate admits that the first party claim file had been reviewed by the UIM negotiator"). Although discovery should be liberally allowed, "fishing expeditions" are not to be countenanced under the guise of discovery. *See Koken*, 911 A.2d at 1025 (stating that while "[d]iscovery is liberally allowed," "[d]iscovery requests must also be reasonable" and "a court can prohibit the discovery of matters which...would amount

to a 'fishing expedition'"). Absent some articulation of a legitimate basis for concluding that any information in the UIM file is reasonably calculated to lead to the discovery of admissible evidence, the relevancy threshold for the production of that file has not been established. Since Sharp's UIM file is not probative of any material issue raised in this case, Travelers' objection to the production of its closed UIM file will be sustained.

### (E) TRAVELERS' CLAIMS/POLICY MANUALS AND EDUCATIONAL/TRAINING MATERIALS

Travelers has also appealed the discovery master's order compelling production of its "claims and policy manuals" and "educational and training materials" that relate to the handling of first party benefits claims, and which were in effect during the time period that Sharp's medical and chiropractic bills were considered and denied. Travelers argues that training and policy manuals have only been deemed discoverable in bad faith actions, and that those materials "will not shed light on the factual issue of whether Travelers improperly withheld payment or whether Travelers engaged in deceptive trade practices." (Docket entry no. 35 at pp. 7-8). Once again, Sharp posits that these documents are discoverable because "[Sharp] has clearly asserted a common law bad faith claim within his complaint." (Docket entry no. 36 at p. 6).

It is beyond cavil that an insurer's claims practice manual setting forth its procedures and guidelines for handling claims is relevant evidence in a bad faith action against an insurer. *See Grossi*, 79 A.3d at 1149; *Zappile v. Amex Assurance Co.*, 928 A.2d 251, 258 (Pa. Super. 2007), *app.*

*denied,* 596 Pa. 709, 940 A.2d 366 (2007); *Bonenberger v. Nationwide Mutual Insurance Company,* 791 A.2d 378, 381-382 (Pa. Super. 2002). Contrary to Sharp's contention, however, he has not advanced a timely, viable bad faith claim against Travelers. Nevertheless, in conjunction with his UTPCPL claim, he has charged Travelers with "deceptive conduct" comprised of alleged malfeasance in the performance of its contractual obligation to pay medical expense benefits. Those allegations of wrongful conduct include: (1) hiring a second chiropractic peer reviewer on July 28, 2009, within four weeks of receiving Dr. Schensul's report dated July 2, 2009 (which had concluded that all past treatment was reasonable and necessary and that further chiropractic treatment was warranted), in an attempt to manufacture grounds for denying coverage for chiropractic care furnished after April 15, 2009; (2) concealing Dr. Schensul's favorable PRO report from Sharp and his counsel when advising them that chiropractic care furnished after April 15, 2009, would not be covered due to the peer review by Dr. Armine; (3) directing Sharp to appear for a medical examination that was cancelled at the last minute, advising Sharp that Travelers would reschedule his examination for a date certain unless Sharp informed Travelers of inconvenient dates within a few days, and contrary to those express instructions, discontinuing payment for chiropractic bills based upon Sharp's alleged "noncompliance" in scheduling and completing the examination; (4) denying payment of a medical physician's bills despite the fact that a peer review had not been conducted by a medical doctor, nor had a physician examined Sharp and concluded that

further medical treatment was unnecessary; and (5) failing to apply uniform standards when contracting with PROs to conduct peer reviews and, instead, abusing the peer review process in cases involving significant first-party benefits coverage limits. Additionally, in considering Sharp's request for treble damages under 73 P.S. § 201-9.2(a), it must be determined whether any such alleged deceptive conduct by Travelers was intentional or reckless. *See Schwartz*, 593 Pa. at 557, 932 A.2d at 898.

Travelers' policy manuals and training materials should reflect its guidelines and philosophy for reviewing claims for medical expense benefits, including the use of peer reviews and medial examinations. *See, e.g., Bonenberger*, 791 A.2d at 381-382 (insurer's claims manual "called for 'aggressive use of [medical examinations],' attempts at catching claimants 'off guard' and assigning cases to defense counsel who fully follow the adjuster's orders and who refrain from exercising independent judgment"). Those materials should indicate whether Travelers has formulated a policy of submitting peer review requests to "biased" PROs for the purpose of fabricating a basis upon which to deny payment of medical or chiropractic bills. *See Perkins*, 589 F.Supp.2d at 567. Conversely, if Travelers' claims handling manual discourages the use of serial peer reviews, particularly after obtaining a PRO report concluding that the treatment reviewed was reasonable and necessary, it could arguably demonstrate that any alleged malfeasance by Travelers' adjusters in that regard was "intentional or reckless," thereby justifying an award of treble damages. *See Schwartz, supra.* In either event,

Travelers' "claims and policy manuals" and "educational and training materials" tend to make a fact at issue more or less probable, and as such, they are relevant to the issues raised in this case. *See Safeguard Lighting System, supra,* at * 3 (finding, in action for breach of contract, bad faith, and UTPCPL violations, that "any material which pertains to instructions and procedures for adjusting claims and which was given to the adjusters who worked on plaintiffs' claim may be relevant to the action and must be produced"); *Jones v. Nationwide Insurance Company,* 2000 WL 1231402, at * 4 (M.D. Pa. 2000) (reasoning that, since insurer "alleged that it had a reasonable basis for handling and investigating the claim," it "has made the claims manual highly relevant").

Consequently, Travelers will be directed to produce its "claims and policy manuals" and "educational and training materials" regarding the consideration and disposition of medical expense benefits claims, to the extent that those policies were in effect in 2009-2010. Travelers' claims manuals could contain confidential or proprietary information with respect to its handling of first party benefits claims. For that reason, Sharp will be required to execute a confidentially agreement barring Sharp, his counsel, their representatives and expert witnesses from divulging, without further leave of court, any information contained in the manuals and materials produced by Travelers. *See Platt v. Fireman's Fund Insurance Company,* 2011 WL 5598359, at * 2 (E.D. Pa. 2011); *Jones, supra.*

(F) CLAIMS REPRESENTATIVES' PERSONNEL FILES

Travelers next challenges the discovery ruling granting Sharp's motion to compel with respect to his request for production of document nos. 10 and 46 seeking the personnel files of Travelers' claims representative who were involved with the consideration of Sharp's medical expense benefits claim. Travelers maintains that those files are not discoverable since Sharp has not asserted a bad faith claim and, "[a]ccordingly, any supposed culpability of Travelers and its employees is wholly irrelevant to the disposition of this case." (Docket entry no. 32 at p. 8). Sharp contends that the requested personnel records are subject to discovery in light of his "allegations of the breach of the implied duty of good faith and fair dealing," and that Sharp "will stipulate that this request should be limited to those items in the personnel files relating to training, experience, work records, qualifications, performance evaluations, etc., and not personal identifying information, health records, or any other embarrassing information." (Docket entry no. 36 at pp. 11-12).

In cases where insureds have sought production of the personnel files of claims representatives who handled the insureds' claims, the courts have uniformly applied "a heightened standard of relevance" to those discovery requests. *See Allied World Assurance Company v. Lincoln General Insurance Co.*, 280 F.R.D. 197,204 (M.D. Pa. 2012); *Santer v. Teachers Insurance and Annuity Association*, 2008 WL 755774, at * 9 (E.D. Pa. 2008); *Carlucci v. Maryland Casualty Company*, 2000 WL 298925, at * 1 (E.D. Pa. 2000); *Kaufman v. Nationwide Mutual Insurance Company*, 1997 WL 703175, at * 1

(E.D. Pa. 1997). Production of personnel files has only been deemed appropriate in bad faith litigation where earlier discovery conducted by the parties has established a sufficient nexus between the personnel file and the bad faith claim. *See, e.g., Saldi v. Paul Revere Life Ins. Co.,* 224 F.R.D. 169, 183-184 (E.D. Pa. 2004) (insurers had implemented "a plan to terminate expensive claims" and actively promoted "the improper termination actions of their employees" via the insurers' "structuring of incentives for their employees," and the adjusters' "personnel files and performance reviews" could reveal information "regarding [the insurers'] knowledge and ratification of the misconduct of their employees as well as [the insurers'] improper incentives for employees"). In all other reported bad faith decisions, discovery of personnel files has been denied. *See Santer, supra,* at * 9 (stating that "the heightened standard to be applied in the context of personnel records counsels in favor of non-disclosure," and finding "it unwise to order even the limited disclosure of the personnel files of those few employees who reviewed plaintiff's file"). Those courts have rejected such discovery on the ground that the insureds may obtain the information sought through less invasive and burdensome means by deposing the claims representatives in question and their supervisors. *See Carlucci, supra,* at * 1 (concluding that although "the plaintiff cites the adjuster's termination for poor performance and the adjuster's deposition testimony that she had complained that she had too many files to handle," the insured could secure bad faith proof "regarding the claims philosophy of the company and the specifics of the adjusters assigned to the plaintiff's claims from

depositions of the supervisors and employees involved"); *Adams v. Allstate Insurance Company*, 189 F.R.D. 331, 333 (E.D. Pa. 1999) (characterizing insured's request for "the personnel files of every Allstate employee who worked on [his] claims" as "unnecessarily invasive," and holding that insured "should seek the information that [he] needs by a less invasive means, such as by deposition"); *Cantor v. Equitable Life Assurance Society*, 1998 WL 306208, at * 3 (E.D. Pa. 1998) (denying requests for personnel files to allegedly demonstrate "the inexperience and lack of training of Equitable's claims handlers," and directing insured to seek requested information by way of depositions of the claims handlers); *Kaufman, supra*, at * 1 (concluding that insured could "determine if nationwide employees are encouraged to pay claims 'as little as they can, as late as they can'...through the depositions of the supervisors and employees involved in the deposition of plaintiff's claim" and "without searching the confidential materials contained in personnel files").

Sharp has not presented a timely bad faith claim against Travelers, nor has he identified a "sufficient nexus" between that purported bad faith claim and the personnel files that he seeks to review. Sharp may depose Travelers' claims representatives to discover information regarding their training and performance evaluations, as well as any company practices relating to peer reviews, medical examinations and processing of medical expense benefits claims. *See Arvonio v. PNC Wealth Management*, 2013 WL 6776299, at * 3 (Lacka. Co. 2013) (under Pa. R.C.P. 4012(a)(3), the court may direct that discovery shall be

conducted "only by a method of discovery...other than that selected by the party seeking discovery"). Therefore, Sharp's motion to compel production of the requested personnel files will be denied, without prejudice to his right to revisit this issue in the event that the depositions of the claims representatives and their supervisors furnish new support for discovery of those files under the "heightened standard of relevance" for such discovery.

## (G) OTHER LITIGATION AND ADMINISTRATIVE COMPLAINTS INVOLVING MEDICAL EXPENSE BENEFITS CLAIMS

In its fourth appeal issue, Travelers contests the discovery ruling requiring it to disclose, in response to Sharp's interrogatory nos. 83, 84, 85 and 94, information relating to lawsuits and Insurance Department complaints filed against Travelers in Pennsylvania between February 13, 2004, and February 13, 2009, relative to first-party medical expense benefits claims where the policies at issue furnished coverage in the amount of $100,000.00 or more. Travelers submits that Sharp's reliance upon *Saldi*, *supra*, is misplaced, and that "[t]here is no reasonable correlation between lawsuits filed against Travelers for failure to disburse benefits under its insurance policies and the issue of whether Travelers engaged in unfair trade practices which induced Sharp to procure the policy." (Docket entry no. 32 at pp. 9-10). Sharp responds that "[i]nformation from other claims, suits and complaints may demonstrate a pattern and practice of illusory coverage under $100,000 first party benefits policies." (Docket entry no. 36 at p. 12).

Several federal district courts have denied discovery requests for "similar claims evidence," even in bad faith litigation, and have reasoned that evidence of other lawsuits or claims is irrelevant since they presumably involve different facts and circumstances. *See Adams*, 189 F.R.D. at 333; *Kaufman, supra*, at * 2; *Shellenberger v. Chubb Life America*, 1996 WL 92092, at * 3 (E.D. Pa. 1996); *North River Insurance Company*, 872 F.Supp. at 1412. Some of those courts have also concluded that production of information concerning other bad faith suits or complaints would be unduly burdensome and cost prohibitive. *See Kaufman, supra*; *North River Insurance Company, supra*; *see also* 17A Couch on Insurance § 251:32 (3d ed.). In rejecting comparable discovery requests, other federal trial courts have opined that pertinent information relating to other litigation involving similar claims can be secured by the insured from Westlaw or Lexis. *See Cantor, supra*, at * 3; *Fidelity & Deposit Co.*, 168 F.R.D. at 525-526.

The only state appellate authority addressing the discoverability of "similar claims evidence" allowed such discovery, provided that it was restricted to the same type of claims at issue in the pending litigation. *See PECO Energy Company*, 852 A.2d at 1235 (holding, in action brought against insurers on claims arising out of environmental damage at gas plants and waste storage areas, that "[o]ther insureds' claims information" was discoverable, but that "the requests must not be unduly burdensome and should be limited to environmental claims."). More recent federal rulings have likewise determined that "other litigation" evidence could lead to the discovery of

admissible evidence, *see Fluke v. Heidrick & Struggles, Inc.*, 2004 WL 884455, at * 3 (E.D. Pa. 2004), and may uncover relevant "pattern and practice" proof, so long as the discovery is confined "to those practices employed in handling plaintiff's claim...." *Santer*, *supra*, at * 3. Such discovery may also unearth earlier depositions or statements by Travelers' claims personnel that may be pertinent to the issues in this case. *See Saldi*, 224 F.R.D. at 191-192 (granting insured's request for "depositions or affidavits of the employees who handled plaintiff's claim or their supervisors in other cases involving allegations of bad faith, unfair claim practices, or breach of the covenant of good faith and fair dealing," and "find[ing] it reasonable to conclude that the previous statements of the employees may well be relevant or may lead to relevant evidence in this case").

In opposing Sharp's discovery requests, Travelers claims that the discovery sought is irrelevant, but does not assert that the requested information in unavailable or that it would be unduly burdensome or expensive to produce it. (Docket entry no. 32 at pp. 9-10). Sharp's interrogatories are narrowly framed and restricted to lawsuits or administrative complaints within a five year period which involve medical expense benefits claims where the first party benefits coverage is $100,000.00 or more. That information is arguably relevant to Sharp's assertion that Travelers engaged in deceptive practices and committed malfeasance by intentionally and arbitrarily targeting medical expense benefits claims for peer reviews, medical examinations and other challenges whenever their

insureds had purchased high coverage limits for first party benefits. As such, it is reasonably calculated to lead to the discovery of admissible evidence in this case.

Thus, Travelers' objections to Sharp's interrogatories nos. 83, 84, 85 and 94 will be overruled, and Travelers will be required to produce information pertaining to lawsuits and administrative complaints filed against it between February 13, 2004, and February 13, 2009, with respect to medical expense benefits claims involving policies with first-party benefits coverage of $100,000.00 or more. In order to protect the privacy and confidentiality interests of non-party insureds who filed any such administrative complaints with the Pennsylvania Insurance Department, Travelers may redact those insureds' names and other identifying information when responding to Sharp's discovery requests. *See PECO Energy Co, supra.*

## (H) PENNSYLVANIA PEER REVIEWS BY TRAVELERS

Travelers has also appealed the discovery master's order directing them to provide an itemization of all "utilization reviews and/or peer reviews" that it performed between February 13, 2004, and February 14, 2009, in cases where the first party medical expense benefits coverage was $100,000 or more.[8] Travelers argues that

---

8. The discovery master apparently confused this civil action with a workers' compensation proceeding when he ordered Travelers to produce records pertaining to its "utilization reviews" involving first party medical expense benefits claims. Under Section 306(f.1) (6) of the workers' compensation act, 77-P.S. § 531(6), and pursuant to 34 Pa. Code §§ 127.401-127.479, an employer or insurer may retain a utilization review organization to conduct a utilization review and to determine the reasonableness or necessity of health care treatment

Sharp's discovery requests for that information "represent yet another attempt by Sharp to engage in bad faith discovery in a case in which no bad faith claim has been asserted." (Docket entry no. 32 at p. 10). Sharp maintains that Travelers "engaged in 'peer review shopping'" after securing PRO opinions finding his chiropractic treatment reasonable and necessary, and "performed peer reviews on and scrutinized more closely" medical expense benefits claims under policies "with higher limits, such as [Sharp's] policy with $100,000." (Docket entry no. 36 at p. 13). Sharp states that he is "willing to enter into a confidentiality agreement relative to [Travelers'] proprietary and confidential business information and/or trade secrets" pertaining to those peer reviews, but insists that the requested information "is directly relevant to [his] theory that Travelers utilized these tactics in a disproportionate number of cases involving high value [first party benefits] policies." (*Id.* at pp. 13-14).

Every PRO, which has been approved by the Insurance Commissioner to provide peer review services in Pennsylvania, must file an annual report with the Commissioner identifying the number of peer reviews performed, the results of the PRO's initial determination,

---

received by an employee for a work-related injury. *See Leca v. W.C.A.B. (Philadelphia School District)*, 39 A.3d 631, 634 (Pa. Cmwlth. 2012) ("Initially, we note that once a compensable work injury is proved or acknowledged, the employer bears the burden to establish through the utilization review process that medical expenses are unnecessary or unreasonable"). As discussed in n. 1, *supra*, auto insurers may contract with PROS to conduct peer reviews to evaluate the reasonableness and necessity of treatment received by an insured who has been injured in an accident involving the maintenance or use of a motor vehicle. *See Terminato, supra*. Travelers' appeal will, therefore, only be considered in the context of Sharp's request for peer review statistics.

the number of requests by insureds or health care providers for reconsideration of the PRO's initial determination, and the number of initial determinations that were overturned on reconsideration. *See* 31 Pa. Code § 69.54(a). Analyses have been conducted of the data contained in the annual reports filed by PROs and have determined that approximately 80% of all initial peer review determinations are decided in favor of the insurers, with more than 80% of the reconsideration peer reviews upholding, in whole or in part, the initial peer reviews that were adverse to the insureds. *See* John F. Duggan, *The Use and Abuse of Peer Review Organizations in Pennsylvania: An Analysis of the Private Enterprise Peer Review System under the Motor Vehicle Financial Responsibility Law*, 98 Dick. L. Rev. 463, 477-478 (Spring 1994); Ronca & Sloane, *Pennsylvania Motor Vehicle Insurance: An Analysis of the Financial Responsibility Law*, § 4.1(iii)(b.1) at pp. 4-8 to 4-10 (3d ed. 2013). One commentator has concluded that the annual "PRO reports support the theory that the private peer review system is inherently biased in favor of the insurer." Duggan, 98 Dick. L. Rev. at 478. Our Supreme Court has observed that "[t]he detachment and neutrality required of a fact-finder is conspicuously absent in the contractual relationship between a PRO and an insurer," *Terminato*, 538 Pa. at 68, 645 A.2d as 1298, while the Superior Court has stated that a PRO "is not a neutral body" and has "a strong financial incentive to appear fair in the eyes of the insurance company," otherwise, "the insurance company will take its business elsewhere." *Harcourt v. General Accident Insurance Company*, 419 Pa. Super. 155, 168, 615 A.2d 71, 78 (1992), *app. denied,*

534 Pa. 648, 627 A.2d 179 (1993).

By reviewing the annual reports that were filed by the approved PROs from 2004 through 2009, Sharp will be able to determine the number of peer reviews that Travelers performed in that five year period. If Travelers identifies the number of peer reviews which were conducted at its request in situations where the medical expense coverage was $100,000.00 or more, Sharp will be able to ascertain whether an inordinance percentage of peer reviews were initiated by Travelers in cases involving higher first party benefits coverage limits. The result would be probative evidence of Sharp's unfair trade practices claim that Travelers improperly targeted insureds with substantial medical expense coverage for peer reviews in an effort to avoid its contractual obligation to honor their claims for medical expense benefits.

No argument has been made by Travelers that the requested peer review information does not exist or that it would be unreasonably expensive or oppressive to provide it. Travelers contends that the peer review information sought by Sharp is irrelevant inasmuch as Sharp has not asserted a bad faith claim. However, for the reasons stated above, this peer review data is germane to Sharp's UTPCPL claim. Accordingly, Travelers' objections will be overruled and it will be ordered to furnish that peer review information, subject to Sharp's execution of an appropriate confidentially agreement protecting Travelers' proprietary and confidential information.

(I)   TRAVELERS'   PAYMENTS   TO   PEER REVIEWERS

The discovery master ordered Travelers to answer Sharp's requests for production of documents nos. 30, 31, 32, 34, 64 and 70 requesting materials reflecting payments made by Travelers to the health care providers who were retained to conduct peer reviews of Sharp's claim for medical expense benefits. According to Travelers, "[i]nsofar as this case is not a bad faith action and the culpability of Travelers in ordering said peer reviews is irrelevant, so too is information concerning payments made to the medical professionals who conducted those reviews." (Docket entry no. 32 at p. 11). Sharp replies that "such information is relevant to [his] theory that [Travelers] participated in 'peer review shopping' to deny [Sharp's] medical benefits and assist in the defense of the UIM claim." (Docket entry no. 36 at p. 15). Sharp again states that he "is willing to enter into a confidentiality agreement with regard to any confidential 'vendor' information withheld on the basis of 'business trade secrets'" (*Id.*).

An insurer may potentially be held liable for actionable malfeasance under the UTPCPL if it knowingly submits "medical bills to a biased PRO knowing that it would receive a determination as to the reasonableness and necessity of treatment which would allow it to deny" payment for those bills. *Perkins*, 589 F.Supp.2d at 567. In the case at hand, Travelers initiated Dr. Armine's peer review of Sharp's chiropractic bills within less than four weeks of the date that it had secured the peer review of Dr. Schensul opining that the same chiropractic treatment was reasonable and necessary and that ongoing treatment was indicated. In determining whether Sharp's chiropractic

bills should have been paid by Travelers in 2009, the fact-finder will have to weigh the credibility of Dr. Schensul and Dr. Armine and the reliability of their conflicting opinions.

Impeachment of an expert witness by demonstrating partiality is always permissible. *Polett v. Public Communication, Inc.*, 83 A.3d 205, 224 (Pa. Super. 2013). Long standing case law recognizes that expert witnesses may always be interrogated regarding the level of compensation that they have received in a matter so as to demonstrate the expert witnesses' bias or partiality, and that it is reversible error for a trial court to prohibit such cross-examination. *See Grutski v. Kline*, 352 Pa. 401, 405-406, 43 A.2d 142, 144 (1945); *J. S. v. Whetzel*, 860 A.2d 1112, 1120 (Pa. Super. 2004); *Coward v. Owens-Corning Fiberglass Corp.*, 729 A.2d 614, 625 (Pa. Super. 1999); *Smith v. Celotex Corp.*, 387 Pa. Super. 340, 350, 564 A.2d 209, 213-214 (1989); *Mohn v. Hahnemann Medical College and Hospital of Philadelphia*, 357 Pa. Super. 173, 178-179, 515 A.2d 920, 923 (1986), *app. discontinued*, 515 Pa. 582, 527 A.2d 542 (1987). In fact, we have previously required medical experts to answer discovery requests seeking information regarding fees that they received for forensic services that they provided for the party who retained them *and* for one particular side of litigation. *See Yadouga*, 66 Pa. D. & C. 4th at 179.

Documents indicating payments that Travelers made to the peer reviewers of Sharp's treatment and bills are relevant to the show potential partiality or bias of those experts. Those records may also shed light on Sharp's

UTPCPL claim relating to Travelers' alleged abuse of the peer review process, including whether Dr. Armine was compensated more handsomely than Dr. Schensul. Therefore, Travelers' objections to Sharp's document requests nos. 30, 31, 32, 34, 64 and 70 will be overruled, and Travelers will be directed to produce those payment records. The confidentiality agreement to be executed by the parties will likewise apply to any confidential or proprietary information contained in the payment records produced by Travelers.

## (J) INFORMATION CREATED AFTER PLAINTIFF'S FIRST-PARTY BENEFITS FILE WAS CLOSED

Last, Travelers appeals the discovery master's decision granting Sharp's motion to compel documents in his first party benefits file that were created after his "claim was formally closed" by Travelers. Travelers contends that the actions alleged in the complaint "took place well prior to the closing of Sharp's first party benefits file," such that "Sharp's request for information generated for his claims file after it was closed is temporally flawed and not relevant to this action because such information has no bearing on the issues alleged in the complaint." (Docket entry no. 32 at p. 12). Sharp counters that "[t]here is no basis to withhold documents based merely on the date produced." (Docket entry no. 36 at p. 18). He further argues that "the fact that Travelers 'reopened' the claim at some point and then 'reclosed' the claim again supports [Sharp's] claim that information cannot be withheld simply based upon when Travelers arbitrarily 'closed' its file" (*Id.*).

Travelers' objection appears to be a hybrid relevancy

and work product doctrine argument. Travelers' contention that its actions following the closing of Sharp's file are irrelevant is without merit. Sharp maintains in this suit that Travelers breached its implied duty of good faith and fair dealing, that Travelers should be required to pay Sharp's counsel fees since it had "no reasonable foundation" to deny payment of his medical and chiropractic bills, 75 Pa.C.S.A. § 1798(b), that Travelers committed malfeasance in the improper performance of its contractual obligations, *see Perkins, supra,* and that Travelers' actionable conduct under the UTPCPL was intentional or reckless and warrants the recovery of treble damages. *See Schwartz, supra.* Once Travelers denied payment for Sharp's medical and chiropractic bills in 2009 — 2010, it was not discharged of any further responsibility to Sharp. Rather, as the Superior Court has stated in describing an insurer's "ongoing vital obligation" to its insured:

> Once an insurer identifies a reasonable foundation for denying a claim, it is not relieved of its duty of good faith and fair dealing. [citation omitted]. In other words, if evidence arises that discredits the insurer's reasonable basis, the insurer's duty of good faith and fair dealing requires it to reconsider its position and act accordingly, all the while remaining "committed to engage in good faith with its insured."

*Condio v. Erie Insurance Exchange,* 899 A.2d 1136, 1145 (Pa. Super. 2006) (quoting *Bonenberger,* 791 A.2d at 381), *app. denied,* 590 Pa. 668, 912 A.2d 838 (2006). *Accord* 14 Couch on Insurance § 207:6 (3d ed.) ("However, the insurer does have a duty to timely make payment once it

becomes aware of facts which makes its previous denial untenable"). Hence, Travelers' conduct following the initial and subsequent closures of Sharp's file is relevant to the existence or absence of a "reasonable foundation" for denying Sharp's claim and its alleged breach of its continuing duties to Sharp.

As the party objecting to discovery on the basis of work product protection, Travelers bears the burden of establishing that the information sought by Sharp is immune from discovery. *Yadouga*, 66 Pa. D. & C. 4th at 168; *McAndrew*, 56 Pa. D. & C. 4th at 7-8. Pennsylvania's version of the work product doctrine is contained in Pennsylvania Rule of Civil Procedure 4003.3, which shields from discovery an attorney's mental impressions, conclusions or opinions "prepared in anticipation of litigation" and pertaining to the merit of a claim or defense or respecting strategy or tactics. *McAndrew*, 56 Pa. D. & C. 4th at 9 (quoting Pa. R.C.P. 4003.3). The final sentence of Rule 4003.3 extends work product protection to non-attorneys as well, and provides that "[w]ith respect to the representative of a party other than the party's attorney, discovery shall not include disclosure of his or her mental impressions, conclusions or opinions respecting the value or merit of a claim or defense or respecting strategy or tactics." Pa.R.C.P. 4003.3.

Prior to the adoption of Rule 4003.3, former Pa.R.C.P. 4001(d) expressly prohibited the discovery of *any* materials prepared by a party's attorney or representative in anticipation of litigation or for trial. *See* Pa.R.C.P. 4003.3, Explanatory Comment (1978). Former Rule

4011(d) provided that "[n]o discovery or inspection shall be permitted which...would disclose the existence or location of reports, memoranda, statements, information or other things made or secured by any person or party in anticipation of litigation or in preparation for trial... other than information as to the identity or whereabouts of witnesses." *Nissley v. Pennsylvania R.R. Co.*, 435 Pa. 503, 506 n. 2,259 A.2d 451, 453 n. 2 (1969). The opening sentence of Rule 4003.3 states that a party may now obtain discovery of any relevant matter, "even though prepared in anticipation of litigation or trial by or for another party or by or for that other party's representative, including his or her...agents." Pa.R.C.P. 4003.3. Thus, the work product doctrine only insulates those materials which reflect the mental impressions of Travelers' lawyers or representatives respecting the value or merit of Sharp's claims or Travelers' defenses and which were "prepared in anticipation of litigation." *See Wuerl v. TEDCO Construction Corp.*, 80 Pa. D. & C. 4th 374, 379 (Alleg. Co. 2006).

"The language of Pa.R.C.P. 4003.3 does not contain a temporal limitation for when material may be deemed 'prepared in anticipation of litigation.'" *Church of the Forgotten Souls v. NGM Insurance Company*, 2011 WL 5244490, at * 3 (Lacka. Co. 2011). "Anticipation of litigation" means in "expectation of or looking forward" to litigation and includes situations where no lawsuit has yet been filed. *Brogan v. Rosenn, Jenkins & Greenwald*, 2013 WL 6437919, at * 3 (Lacka. Co. 2013) (quoting *In re Hennine Estate*, 4 Pa. D. & C. 4th, 462, 465 (Alleg.

Co. 1989)). Therefore, any opinions formed by Travelers' attorneys or representatives concerning the value or merit of Sharp's claims or Travelers' defenses may constitute protected work product even if they were developed and memorialized before Sharp commenced this action. *See Church of the Forgotten Souls, supra,* at * 4; *Mueller v. Nationwide Mutual Insurance Company,* 31 Pa. D. & C. 4th 23,30(Alleg. Co. 1996).

A determination must be made as to whether the records and information being withheld by Travelers qualifies as protected work product. Travelers will be directed to submit its alleged work product materials to the special discovery master for an in camera review. *See Barrick v. Holy Spirit Hospital of the Sisters of Christian Charity,* 32 A.3d 800, 812 (Pa. Super. 2011) ("We acknowledge that an *in camera* review may be necessary in order to determine precisely what aspects of the correspondence fall within the parameters of the attorney work-product doctrine"), *app. denied,* 616 Pa. 589, 52 A.3d 221 (2012). Travelers will also be required to furnish the discovery master with "a" privilege log identifying by page all records which are being produced, together with the bases for the privileges asserted." *McAndrew,* 56 Pa. D. & C. 4th at 7. Following his review of those documents, the discovery master will issue an order identifying those materials which must be produced by Travelers and what records and information are shielded from discovery by the work product doctrine. An appropriate order follows.

## ORDER

And now, this 7th day of March, 2014, upon

consideration of the "appeal motion of plaintiff, Rowland Sharp, Pursuant to Lackawanna County Local Rule 4000.1(b) of the November 7, 2013 discovery order of the special discovery master," the "defendant's petition for *De Novo* appeal of the November 7, 2013 order of the discovery master," the memoranda of law submitted by the parties, and the oral argument of counsel, and based upon the reasoning set forth in the foregoing memorandum, it is hereby ordered and decreed that:

1. Plaintiff's *de novo* appeal of the special discovery master's order of November 7, 2013, is denied, and defendant's objections to plaintiffs interrogatories nos. 29 and 30 and requests for production of documents nos. 7, 66 and 67 are sustained;

2. Defendant's *de novo* appeal of the special discovery master's order of November 7, 2013, is granted in part and denied in part;

3. Defendant's *de novo* appeal is granted and defendant's objections are sustained as to plaintiff's interrogatories nos. 11, 17, 53, 54 and 63 and requests for production of documents nos. 1,2,3,4,6, 7, 8, 9, 10, 16, 32,46 and 74;

4. Defendant's *de novo* appeal is denied and defendant's objections are overruled as to plaintiff's interrogatories nos. 39,40,41, 42, 43,44, 45, 47, 64, 83, 84, 85, 94, 99, 100 and 101 and requests for production of documents nos. 19, 20, 21, 22, 23, 24, 30, 31, 32, 33, 42, 43, 44, 45, 50, 51, 52, 53, 54, 55, 56, 57, 58,63, 64, 68, 69 and 70;

5. Plaintiff shall execute a confidentiality agreement with respect to any proprietary information or trade secrets

contained in defendant's claims practices manuals, training materials, and vendor agreements with peer reviewers and peer review organizations, and defendant may redact the identities of any insureds who filed administrative complaints against the insurer with the Pennsylvania Insurance Commissioner;

6. Within thirty (30) days of plaintiff's execution of a confidentiality agreement prohibiting him from divulging or disseminating, without further leave of court, any documents or information referenced in paragraph (5) above, except to plaintiff's counsel, expert witnesses and consultants, and any discovery deponents, defendant shall provide the requested discovery identified in paragraph (4) above; and

7. Within the next thirty (30) days, defendant shall submit the materials identified in its privilege log for first party log notes nos. 60, 61-96, 98, 99 and 110 and its claims file Bates nos. 545, 649, 746, 757, 773, 747-756, and 758-771 for an *in camera* review by the special discovery Master and a determination as to whether those documents and information are protected from discovery by the work product doctrine.